PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1189

FLAME S.A.,

Plaintiff - Appellee,

v.

FREIGHT BULK PTE. LTD.,

Defendant - Appellant,

and

INDUSTRIAL CARRIERS, INC.; VISTA SHIPPING, INC.; VIKTOR
BARANSKIY; GLORY WEALTH SHIPPING PTE LTD.,

Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk.  Robert G. Doumar, Senior
District Judge.  (2:13-cv-00658-RGD-LRL)

Argued: May 14, 2014                Decided: August 5, 2014

Before WILKINSON, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion.  Judge Agee wrote the opinion, in
which Judge Wilkinson and Judge Diaz joined.  Judge Wilkinson
wrote a separate concurring opinion.

**ARGUED**: Charles Alan Rothfeld, MAYER BROWN, LLP, Washington,
D.C., for Appellant.  William Robert Bennett, III, BLANK ROME
LLP, New York, New York, for Appellee.  **ON BRIEF**: Carmine R.

Zarlenga, Richard Caldarone, Paul W. Hughes, MAYER BROWN LLP, Washington, D.C., for Appellant.  Alan M. Weigel, Lauren B. Wilgus, Nicholas R. Tambone, BLANK ROME LLP, New York, New York, for Appellee.

———————

AGEE, Circuit Judge:

Freight Bulk Pte. Ltd. ("Freight Bulk") appeals from the district court's order denying its motion to vacate a writ of maritime attachment previously issued in favor of Flame S.A. ("Flame") under Supplemental Rule B of the Federal Rules of Civil Procedure ("Rule B"). Flame filed a verified complaint in the Eastern District of Virginia seeking attachment of a shipping vessel for purposes of satisfying an English judgment, the underlying basis of which was a claim for breach of certain Forward Freight Swap Agreements ("FFAs"). The district court denied Freight Bulk's motion to vacate after concluding that its jurisdiction was determined by reference to federal, rather than English, law and that the FFAs are maritime contracts under federal law. For the reasons set forth below, we affirm the decision of the district court.

I.

In 2008, Flame, an integrated shipping and trading company organized under the laws of Switzerland and headquartered in Lugano, Switzerland, entered into four FFAs with Industrial Carriers, Inc. ("ICI"), a corporation organized under the laws

of a foreign country and registered to do business in the state of New York.[1]

FFAs are similar to futures or hedging contracts tied to the spread between a specified rate and market shipping prices at a future date. To act as a diversification against the vagaries of future maritime price fluctuations, shippers like Flame may enter into FFAs with another party although any entity could be a contracting party even if unrelated to the maritime industry. The FFAs in this case identified particular shipping routes listed in a specified maritime freight index, the Baltic Panamax Index, which provides market freight rates for the maritime industry. The shipping services contemplated in an FFA would likely never be performed by the parties who would usually settle the contract by exchanging cash, as the parties intended in this case.

FFAs can be complicated financial transactions, but we found the Second Circuit's description of how FFAs work in D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd., No. 11-3473-cv, 2014 WL 2609648 (2d Cir. June 12, 2014), an easy to follow narrative of the type of agreement at issue here:

---

[1] Three of the FFAs specified Flame as the seller and ICI as the buyer. The fourth was the reverse, with ICI as seller and Flame as the buyer. The record reflects only that ICI was a foreign corporation, but does not identify its country of origin.

4

> A major risk of an ocean carrier's business is that a slowdown in worldwide commercial activity will lead to diminution in shipments of cargo, causing vessels to make expensive voyages partially empty or, in more extreme circumstances, to lay idle. The rates carriers charge for carriage of goods fall during such slowdowns. . . . As a way of offsetting losses from its vessels being underemployed or idle during such a slowdown, [a carrier may] enter[] into futures contracts on international shipping rates. These contracts, sometimes called "forward freight agreements" or "FFAs," specify a base rate (the "contract rate") for a hypothetical shipment of specified goods over specified routes and future dates for comparison of the contract rate with the market rates on such future dates. If on a specified future date the market rate is above the contract rate, then the party that took the downside of the agreement must pay the other party the difference. If on the future date the market rate is below the contract rate, the party that took the upside of the contract must pay the other party the difference. Profits realized from such contracts as rates fall will increase [the carrier's] revenues when demand is low, counteracting its losses from underemployment. Conversely, the losses on such contracts will decrease [the carrier's] net revenues when demand is high and rates rise.

D'Amico, 2014 WL 2609648, at *1.

In September 2008, freight rates in the international shipping market entered a steep decline, causing ICI to become financially distressed. In October 2008, ICI voluntarily petitioned for bankruptcy in Greece, which constituted an Event of Default under the terms of the FFAs. Under the FFAs, ICI owed

5

Flame a substantial amount based on the difference between the contract and market rates.

In November 2010, Flame brought suit against ICI in the High Court of Justice, Queen's Bench Division, Commercial Court in London, England (the "English Court"), alleging breaches of the FFAs and seeking monetary damages. The English Court entered judgment against ICI on December 13, 2010 in the amount of $19,907,118.36 (the "English judgment").

After obtaining the English judgment against ICI, Flame moved for recognition and enforcement of that judgment in the United States District Court for the Southern District of New York.[2] ICI appeared before the district court and moved to dismiss for failure to state a claim, arguing that it did not have notice of the action in the English Court. The district court denied ICI's motion. ICI's counsel subsequently filed a motion to withdraw as counsel, which the district court granted. When granting the withdrawal motion, the district court warned ICI that it must obtain new counsel or face a default judgment. ICI failed to obtain substitute counsel, and the court entered

---

[2] No federal statute provides for the recognition of foreign judgments. Instead, federal courts generally recognize judgments of foreign courts out of comity. See Hilton v. Guyot, 159 U.S. 113, 163–64, 202–03 (1895).

6

default judgment on October 4, 2011,[3] recognizing the English judgment in favor of Flame.

On October 17, 2013, Flame registered the judgment of the Southern District of New York in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1963. Flame then filed a verified complaint seeking an Order of Attachment against the shipping vessel M/V CAPE VIEWER (the "CAPE VIEWER"), docked at Norfolk, Virginia, pursuant to Rule B. Flame sought attachment of the CAPE VIEWER, which is owned by Freight Bulk, on the theory that Freight Bulk is the alter ego of ICI. The district court issued an attachment order, which was timely served on Freight Bulk.

Freight Bulk then appeared and moved the district court to vacate the Order of Attachment pursuant to supplemental Rule E(4)(f), arguing that the court lacked subject matter jurisdiction to enter the order. In particular, Freight Bulk contended that (1) the district court should apply English law in determining whether the FFAs are maritime contracts; and (2) regardless of the court's choice of law, FFAs are not maritime contracts. Because Flame invoked only the court's maritime

---

[3] The United States District Court for the Southern District of New York entered default judgment in recognition of the well-established rule that "'a corporation may appear in the federal courts only through licensed counsel.'" See In re Under Seal, 749 F.3d 276, 290 n.17 (4th Cir. 2014).

7

jurisdiction in its complaint, Freight Bulk argued that in the absence of a valid maritime claim the district court lacked subject matter jurisdiction and had no authority to enter the Rule B Order of Attachment.

After several hearings on Freight Bulk's motion to vacate, the district court denied that motion with respect to Freight Bulk's jurisdictional arguments.[4] Specifically, the district court concluded that it had properly exercised its admiralty jurisdiction over the case because federal law, rather than English law, controlled that issue. The district court determined that FFAs are maritime contracts under federal law. "However, considering the complexities and uncertainties involved . . . and the importance of clarifying the procedural issues presented," the district court certified the matter for expedited appeal to this Court. Flame S.A. v. Industrial Carriers, Inc., No. 2:13-cv-658, 2014 WL 108897, at *4 (E.D. Va.

---

[4] In its Rule E(4)(f) motion to vacate, Freight Bulk also asserted that Flame's Complaint failed to set forth a legally sufficient basis upon which to pierce Freight Bulk's corporate veil. The district court withheld ruling on this separate issue of whether Flame properly pled that Freight Bulk is the corporate alter ego of ICI. As that question was not decided by the district court, it is not before us on appeal, and we offer no opinion on the issue.

Jan. 10, 2014). Freight Bulk then sought permission to file an interlocutory appeal, which this Court granted.[5]

## II.

This case presents two distinct issues on appeal, both of which concern the court's subject matter jurisdiction. First, we must determine whether federal law or foreign law controls our jurisdictional inquiry. Second, we must consider whether the FFAs at issue in this case are maritime contracts under the controlling law, establishing whether the district court could properly exercise admiralty jurisdiction in this case. We review the district court's legal conclusions regarding its own subject matter jurisdiction de novo. See Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 533 (4th Cir. 2013). "We review the district court's factual findings with respect to jurisdiction for clear error." Velasco v. Gov't of Indon., 370 F.3d 392, 398 (4th Cir. 2004).

---

[5] Section 1292(b) of 28 U.S.C. allows for the interlocutory appeal of an otherwise unappealable order when a district court judge certifies that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

III.

A.

"The judicial Power [of the United States] extend[s] . . . to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. In addition to this constitutional grant of original jurisdiction to the federal courts over admiralty matters, Congress has made plain the federal courts' exclusive authority over admiralty cases first with the Judiciary Act of 1789 and presently in 28 U.S.C. § 1333. That statute provides that "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333; see Judiciary Act of 1789, § 9, Ch. 20, 1 Stat. 73, 76–77.

Since the Founding, the Supreme Court has made clear the authority and primacy of the federal courts in matters of admiralty particularly as relates to the recognition of foreign admiralty judgments.

> It is well recognized that federal courts in the United States possess jurisdiction in admiralty over claims to enforce a foreign admiralty judgment. See, e.g., 1 Benedict on Admiralty § 106 ("[A]dmiralty jurisdiction in the United States may be broadly stated as extending to ... any claim to enforce a judgment of a foreign admiralty court."). Even in the

10

earliest days of the Republic, the Supreme Court *534 confirmed that the courts of the United States possess jurisdiction to recognize the admiralty decrees of foreign admiralty courts. See Penhallow v. Doane's Adm'rs, 3 U.S. (3 Dall.) 53, 97, 1 L. Ed. 507 (1795) (Iredell, J.) ("It was clearly shown at the bar, that a Court of Admiralty, in one nation, can carry into effect the determination of the [C]ourt of Admiralty of another.").

Vitol, 708 F.3d at 533–34.

To proceed on a request for a Rule B writ of maritime attachment, the plaintiff must have a claim against the defendant that is cognizable in admiralty. See Vitol, 708 F.3d at 533–34 (considering whether the court had admiralty jurisdiction over a request for attachment under Rule B). In the case before us, the initial issue is whether United States courts apply the law of the foreign jurisdiction that rendered the judgment to determine if the claim is cognizable in admiralty or whether the maritime law of the United States determines the admiralty status of that claim.

As the district court recognized, the distinction between English and American law is determinative in the case at bar.

> It is apparent to the Court that under English law the [FFAs] would not be maritime contracts and as a result the English judgment in this matter would not be an admiralty judgment. Therefore, if English law were used in addressing this Rule B attachment, no admiralty jurisdiction would exist.

11

> Under federal law, however, it appears
> that the [FFAs] in question would certainly
> be maritime contracts.

_Flame_, 2014 WL 108897, at *3. Thus, the district court concluded "if federal law is applied, then this Court has admiralty jurisdiction. If English law is applied, there is no admiralty jurisdiction." _Id._ at *1.

Both before the district court and on appeal, Freight Bulk has argued that a claim to enforce a foreign judgment falls within a federal court's admiralty and maritime jurisdiction only if the claim underlying the foreign judgment would be considered a maritime claim under the laws of the foreign jurisdiction that rendered the judgment. The district court rejected Freight Bulk's argument and concluded that the maritime nature of a claim to enforce a foreign judgment must be determined under the laws of the United States. The district court characterized the issue as "a question of choice of law on a procedural issue" and noted that "[g]enerally, procedural questions in federal court are governed by federal law," which led it to its ultimate conclusion that "federal law should inform this Court's determination of whether it has admiralty jurisdiction." _Flame_, 2014 WL 108897, at *2, *3.

The district court determined that there was no directly applicable Fourth Circuit precedent on the issue despite Freight Bulk's argument that our prior decision in _Vitol_ dictated a

12

result in its favor. In the absence of controlling authority, the district court looked to analogous precedent from the Supreme Court in Norfolk Southern Railway v. Kirby, 543 U.S. 14 (2004), and the Second Circuit's opinion in Blue Whale Corp. v. Grand China Shipping Development Co., 722 F.3d 488 (2d Cir. 2013). In our review of the district court's decision and the arguments presented to us, we first examine the impact of Vitol and then consider the application of other precedent.

B.

Freight Bulk contends that our prior opinion in Vitol requires holding that a claim's characterization under foreign law controls our jurisdictional inquiry. We disagree. Freight Bulk's reliance on Vitol is misplaced.

In Vitol, we considered whether a district court's Rule B attachment order to enforce a foreign admiralty judgment was properly issued. 708 F.3d at 533. The defendants-appellees in Vitol (the companies owning or controlling the vessel) argued that the district court lacked admiralty jurisdiction because the plaintiff-appellant (the company seeking Rule B attachment and judgment holder) elected to pursue its cause of action in the English Commercial Court rather than the Admiralty Court (both part of the English High Court of Justice). In the Vitol appellants' view this choice of forum in England made the

13

foreign judgment obtained a non-admiralty judgment.[6] Id. at 534. We rejected that argument:

> [The appellee ship owners] ask this Court to hold that the choice of forum in England, not the subject matter of the underlying claim, is dispositive of whether jurisdiction lies with the district court pursuant to 28 U.S.C. § 1333. In other words, [appellees] contend that [the] choice of forum in the English Commercial Court for an otherwise valid admiralty claim there divests any resulting judgment of its admiralty character in this country so it can no longer be considered as an admiralty matter. We find this argument unpersuasive and unsupported.
>
> The approach advocated by [appellees], which looks purely to form at the expense of substance, is unsupported by citation to any case as authority for its position. Indeed, the dispositive question is not whether the English Judgment issued from an "admiralty court," but rather, whether the claim itself is maritime in nature.

Id. at 535 (emphasis added).

The issue Freight Bulk now raises, whether federal or foreign law applies when characterizing a foreign judgment as an admiralty judgment for purposes of federal jurisdiction, was not an issue in Vitol. As the Second Circuit recognized in D'Amico:

> the Vitol decision did not constitute a precedent on the question whether the maritime character of the claim under U.S.

---

[6] The parties in Vitol did not dispute that the claim at issue was a maritime claim under either federal law or English law or that the English court had jurisdiction to render its judgment. See Vitol, 708 F.3d at 533–35.

14

> law is pertinent, both because the Vitol court never considered the question whether U.S. law should be consulted, and because the answer would have been the same under either British or U.S. law, as the underlying claim (breach of the warranty of seaworthiness) is maritime in both nations. Vitol never considered whether the maritime character of the underlying claim under U.S. law standards justifies the exercise of federal admiralty jurisdiction.

2014 WL 2609648, at *6. Vitol resolved the isolated issue raised in that case and no more. Freight Bulk's argument to the contrary is without merit.

C.

Supreme Court precedent strongly indicates that federal law should control our determination of whether a claim, such as the FFA dispute in this case, sounds in admiralty. Although the Supreme Court has not directly addressed the issue, its opinion in Kirby offers guidance.

In Kirby, the Supreme Court considered whether federal or state law governed the interpretation of two maritime contracts. 543 U.S. at 22–23. The Court concluded that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." Id. In reaching this conclusion, the Supreme Court explained that Article III's purpose in granting admiralty jurisdiction to the federal courts was to provide for the uniformity of maritime law

15

throughout the country, including the uniform interpretation of maritime contracts. Id. at 28.

> It certainly could not have been the intention [of Article III] to place the rule and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.

Id. at 28-29; see also Ins. Co. v. Dunham, 78 U.S. (11 Wall.) 1, 24 (1870) (holding that "the admiralty and maritime jurisdiction of the United States is not limited either by the restraining statutes or the judicial prohibitions of England, but is to be interpreted by a more enlarged view of its essential nature and objects"). As the district court observed, based upon the constitutional principle of uniformity in the maritime context, "it could not have been the intention of Article III's grant of admiralty jurisdiction to place the rules and limits of maritime law under the disposal and regulation of foreign states." Flame, 2014 WL 108897, at *2 n.2.

This conclusion was bolstered by the Second Circuit's opinion in Blue Whale, which is instructive in part. While seemingly on point, the Blue Whale decision discusses the similar, but ultimately distinct, issue of whether a plaintiff "has a valid prima facie admiralty claim" for purposes of

16

satisfying the four-factor test for issuing a Rule B attachment adopted in Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434 (2d Cir. 2006). Blue Whale, 722 F.3d at 493. The Second Circuit split its inquiry into two parts: (1) whether the plaintiff alleged a claim sounding in admiralty, and (2) whether that claim is prima facie valid. Id. Recognizing a "split of authority" in the Southern District of New York, the Second Circuit reached the choice-of-law issue even though "[n]either party disputed that [the plaintiff] had alleged a claim sounding in admiralty and that the court had maritime jurisdiction." Id. at 491. The court explained:

> Despite the divide, what is clear is that federal law controls the procedural inquiry, namely, whether a plaintiff's claim sounds in admiralty. This question is inherently procedural by virtue of its relationship to the courts' subject matter jurisdiction and, thus, is controlled by federal maritime law. . . . We hold that federal maritime law governs whether a claim sounds in admiralty.

Id. at 494–95.[7] Thus, while helpful, the Second Circuit's treatment of the issue in Blue Whale is only analogous precedent.

After briefing and oral argument in the case at bar, the Second Circuit decided D'Amico which does directly address the jurisdictional question before us. In D'Amico, the holder of an

_____

[7] The court then proceeded to the second part of its inquiry, which is not relevant to this case.

17

English judgment sought attachment under Rule B invoking the district court's admiralty jurisdiction. 2014 WL 2609648, at *1. The district court concluded that it lacked jurisdiction because "the maritime nature of [a] claim must be determined by reference to the law of the nation that rendered the judgment," and under the laws of England, "the claim underlying the judgment was not deemed maritime in English law." Id. at *2.

The Second Circuit vacated the judgment of the district court, holding that "a suit to enforce a foreign judgment may be heard in the federal admiralty jurisdiction under § 1333 if the claim underlying the judgment would be deemed maritime under U.S. law." Id. at *9. In a thorough analysis, the D'Amico court persuasively concluded that choice of law principles support using federal law because "[t]he question whether a claim belongs in one or another court is jurisdictional and procedural," and "[u]nder choice of law principles, the law of the forum state is used for such a question." Id. at *8.[8]

The Second Circuit in D'Amico reached the same conclusion that Kirby leads us to: that by extending federal jurisdiction to "all Cases of admiralty and maritime Jurisdiction," "the Framers of the Constitution and Congress wanted to ensure that

_____

[8] In the district court and before us, Freight Bulk relied on the decision from the Southern District of New York in D'Amico. Now that the Second Circuit has reversed that decision, Freight Bulk is left with scant authority for its argument.

18

matters deemed maritime *under our laws* have access to our federal courts." Id. at \*7. As the D'Amico court explained:

> The policy of the United States to place maritime matters in the federal courts is so strong that § 1333 makes federal court jurisdiction exclusive. Although, as a general proposition, there is widespread agreement throughout the world which kinds of matters are maritime and which are not, there is no assurance that some other nation might not define its own maritime jurisdiction more broadly, or more narrowly, than we do. It seems reasonable to assume that the Framers of the Constitution and Congress wanted to ensure that matters deemed maritime under our laws have access to our federal courts. There is no reason to suppose that the Founders or Congress would have wished to exclude from the admiralty jurisdiction matters that U.S. law deems maritime, merely because another nation does not consider them maritime. The fact that some nation, unlike ours, does not reserve a special jurisdiction for maritime matters, or classify maritime matters as subject to a discrete body of laws, does not derogate from the policies of our law to provide for the adjudication of matters we regard as maritime in our federal courts.

Id. at \*7.

Based on the Supreme Court's reasoning in Kirby and the on-point and persuasive opinion in D'Amico, we hold that federal law, rather than foreign law, controls the procedural inquiry into whether a foreign judgment is a maritime judgment. Thus, a claim to enforce a foreign maritime judgment is within the admiralty subject matter jurisdiction of United States courts

19

when the claim underlying the judgment would be an admiralty or maritime claim under federal law.

## IV.

## A.

Having determined that federal law controls our jurisdictional inquiry, we must now consider whether the FFAs at issue in this case are maritime contracts under federal law. If the FFAs are not maritime contracts, then the district court's admiralty jurisdiction could not be invoked.

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). Whether a contract is maritime depends not upon "whether a ship or other vessel was involved in the dispute." Kirby, 543 U.S. at 23. "Instead, the answer 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" Id. at 24; see 1-XII Benedict on Admiralty § 182 (providing that "a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction").

20

In consideration of this question, the district court stated, "Under federal law, it is clear that the question of whether the [FFAs] are maritime contracts is answered in the affirmative," citing a number of decisions holding that certain FFAs are maritime contracts. Flame, 2014 WL 108897, at *3. Thus, the district court seemingly made a broad holding that all FFAs are maritime contracts under federal law.

However, other language in the district court's opinion indicates that its holding is more nuanced and specific to the FFAs in this case. For example, the district court observed that "Flame's use of [FFAs] appears to have been primarily for hedging the risks inherent in their shipping business" and that "the [FFAs] in question would certainly be maritime contracts," which Freight Bulk also challenges. Id. (emphasis added). The district court then seemed to express a case-specific holding that "the FFAs in question (and Flame's underlying claim) are maritime contracts." Id.

Ultimately, we need not resolve whether all FFAs are maritime contracts as a matter of law or remand the case for further consideration. Instead, because the district court made factual findings limited to the FFAs involved here, we affirm the district court's judgment with respect to the FFAs at issue in this case. We leave to another case the issue of whether all FFAs are maritime contracts as a matter of law.

21

On appeal, Freight Bulk argues that the FFAs cannot be maritime contracts because they have no connection to any particular vessel or to the transport of any particular cargo. Freight Bulk points out that the FFAs at issue in this case could be settled only with cash and not by delivery (i.e., performance of an actual shipment across the designated route). And Freight Bulk posits that FFAs cannot be maritime contracts because they are nothing more than financial bets on the direction of the freight shipping market.

First, with respect to Freight Bulk's argument that the FFAs have no connection to any particular vessel or shipment, the Supreme Court has directly held that a maritime contract need not refer to any particular vessel. See Kirby, 543 U.S. at 23 ("To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute."). Nor do maritime contracts need to refer to any particular shipment. See generally Folksam. Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d 307 (2d Cir. 2005) (holding that an insurance contract providing coverage for losses sustained to vessels while undergoing repairs is a maritime contract). In fact, several district courts have concluded that FFAs are maritime contracts regardless of the fact that they do not refer to any particular vessels or shipments because "the

22

purpose of the [FFA] is to facilitate maritime commerce." Flame S.A. v. M/V Lynx, No. 10-00278, 2010 U.S. Dist. LEXIS 145880, at *9 (E.D. Tex. June 22, 2010); see Transfield ER Futures Ltd. v. Deiulemar Shipping S.P.A., Nos. 11-00099, 11-00754, 2012 WL 123286, at *3 (E.D. La. Jan. 17, 2012) (concluding that "the very essence of these FFAs concerns commitments to perform shipping services in the future" and that the FFA contracts, like those at issue in this case, provided "contract routes, contract months, contract quantity, the date upon which payment was due for such services and contract rates that would govern each particular contract"). Thus, the fact that the FFAs in this case did not refer to a particular vessel or a particular voyage is not dispositive.

Second, the fact that the FFAs could be settled only with cash also does not defeat the conclusion that these FFAs are maritime contracts. Again, marine insurance contracts are usually maritime contracts as a matter of law. See Dunham, 78 U.S. (11 Wall.) at 30-36. Marine insurance contracts cover risks inherent in maritime transportation, and, like the FFAs in this case, marine insurance contracts call for the payment of cash rather than the execution of a maritime shipment. See Int'l Sea Food Ltd. v. M/V Campeche, 566 F.2d 482, 485 (5th Cir. 1978); 16 Williston on Contracts § 49:28 (4th ed. 2014 supp.). Thus, that

23

the FFAs call for cash settlement does not preclude the conclusion that they are maritime contracts.

Lastly, as Freight Bulk points out, while in some cases financial speculators could enter into an FFA on either side of the transaction, we need not resolve the global issue of whether all FFAs are maritime contracts. In this case, there is no dispute that both Flame and ICI are shipping companies principally engaged in maritime commerce. It thus follows, as the district court found, that Flame and ICI did not create the FFAs as mere financial speculators, but as a component of their shipping businesses. The district court expressly found that the parties entered into the FFAs "primarily for hedging the risks inherent in their shipping business," a finding that Freight Bulk fails to demonstrate is clearly erroneous.[9] Flame, 2014 WL 108897, at *3.

We therefore hold that the district court did not err in concluding that the FFAs at issue in this case are maritime

---

[9] Freight Bulk contests this finding by arguing that Flame was listed as the seller on some of the FFAs and thus could not have been using the FFAs as a hedge. However, Freight Bulk does not contest that the FFAs listing Flame as the seller were used by the parties as hedges in their shipping businesses or that both Flame and ICI are chiefly engaged in the business of international shipping. Thus, consistent with the district court's finding, all of the FFAs here were used "primarily for hedging the risks inherent in" international shipping regardless of which party was listed as the buyer or seller on each instrument.

contracts. Accordingly, the district court had subject matter jurisdiction to adjudicate the matter before it.[10]

V.

For the foregoing reasons, we affirm the district court's decision.

AFFIRMED

---

[10] We note that our holding is consistent with that of a number of out-of-circuit district courts that have considered whether similar FFAs are maritime contracts under federal law. See Transfield, 2012 WL 123286, at *3; Flame, 2010 U.S. Dist. LEXIS 145880, at *12; Primera, 2010 WL 481075, at *2; Brave Bulk Transport Ltd. v. Spot On Shipping Ltd., No. 07 Civ. 4546(CM), 2007 WL 3255823, at *2 (S.D.N.Y. Oct. 30, 2007).

WILKINSON, Circuit Judge, concurring:

I readily concur in Judge Agee's fine opinion in this case. Notwithstanding my respect for English law, and in full agreement with the majority opinion, I write to underscore my conviction that the availability of federal admiralty jurisdiction simply must be determined by domestic, rather than foreign, law.

First, applying the law of the forum -- here, federal court -- accords with basic choice-of-law principles. In Blue Whale Corp. v. Grand China Shipping Development Co., 722 F.3d 488, 494 (2d Cir. 2013), the Second Circuit held that the question of whether a claim "sounds in admiralty" is "inherently procedural by virtue of its relationship to the courts' subject matter jurisdiction," that jurisdiction being, in the Second Circuit's view, a procedural matter. Because courts generally apply their own procedural law, the jurisdictional issue "is controlled" by the law of the forum: federal maritime law.

In fact, the argument for applying domestic law is even stronger than the Second Circuit suggested. Rules of jurisdiction are conceptually distinct from rules of procedure; the former determine whether a court is competent to hear a particular case, whereas the latter govern how the court is to hear it. See Bowles v. Russell, 551 U.S. 205, 210-11 (2007);

Scott Dodson, In Search of Removal Jurisdiction, 102 Nw. U. L. Rev. 55, 59-60 (2008).

Therefore, a court could theoretically import foreign procedure, just as it might use foreign substantive law as its rule of decision. Strictly speaking, however, it is incoherent to speak of adopting foreign law to decide the jurisdictional question. Jurisdiction is the sovereign grant of authority to make legally binding rules or determinations in a particular situation. To allow foreign law to dictate the availability of subject-matter jurisdiction would be to divest the Constitution and Congress of their sovereign authority to decide the extent of the power of the judicial branch. In other words, federal courts would no longer be acting as courts of the United States, since their power would be exercised pursuant to a grant of authority from a different sovereign -- here, the foreign jurisdiction. It would, as Justice Story recognized in a related context, "annihilate the sovereignty and equality of the nations," and violate the principle that "every nation must judge for itself, what is its true duty in the administration of justice." Joseph Story, Commentaries on the Conflict of Laws §§ 32, 34 (1834).

Second, considerations of administrability counsel in favor of using domestic, rather than foreign, law to determine subject-matter jurisdiction. Even if we limit ourselves to the

27

many major maritime commercial powers, that would still require courts seeking to determine jurisdiction to analyze a different body of foreign law every time a contract with a different choice-of-forum or -law clause or every time a judgment from a different rendering jurisdiction came before them. See D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd., No. 11-3473-cv, 2014 WL 2609648, at *8 (2d Cir. June 12, 2014). To make matters worse, other countries may not have the same conceptual frameworks for determining jurisdiction or maritime status as we do. This will often make asking whether a contract or judgment is maritime under their law for the purposes of our requirements of subject-matter jurisdiction anything but an apples-to-apples analysis, if not entirely meaningless.

Not only would this inquiry be incongruous, it would also impose an immense administrative burden on the judicial process. Our own law distinguishing maritime from non-maritime contracts has frequently been pilloried as opaque and arbitrary. See, e.g., Charles L. Black, Jr., Admiralty Jurisdiction: Critique and Suggestions, 50 Colum. L. Rev. 259, 264 (1950) ("The attempt to project some 'principle' is best left alone. There is about as much 'principle' as there is in a list of irregular verbs."). To force courts and litigants down the rabbit hole of incorporating the law of various foreign countries at the jurisdictional stage would only make matters worse. See

28

D'Amico, 2014 WL 2609648, at *8. Limiting the inquiry to the maritime status of a contract or judgment under domestic law is the best and most administrable option.

Third, applying domestic law in this case accords with the Constitution's and Congress's vesting of admiralty jurisdiction in federal courts.  Imagine what would happen if we held that foreign law controlled the jurisdictional inquiry here.  The federal court would lack admiralty jurisdiction and appellee would likely thus have to file suit in state court.  (The same situation would occur if the parties were U.S. but non-diverse.) Thus, the state court would probably be the only available forum to hear the claim and the special procedures associated with federal admiralty jurisdiction might not be available.

None of this is to say that state courts are incapable of properly adjudicating maritime issues.  But it does fly in the face of the Constitution's vesting of subject-matter jurisdiction in Article III courts over "all Cases of admiralty and maritime Jurisdiction," U.S. Const. art. III, § 2, cl. 1 (emphasis added), and Congress's grant to federal district courts, virtually unchanged since the Judiciary Act of 1789, of subject-matter jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(1) (emphasis added). Whether to promote greater uniformity in maritime law or to ensure the vindication of American maritime interests, the

29

Framers clearly wanted federal courts to possess admiralty jurisdiction over those cases that the courts believed to be maritime in nature. See D'Amico, 2014 WL 2609648, at *7. Allowing foreign law to control the jurisdictional inquiry would subvert this goal and constrict the space that federal courts, already sandwiched between foreign and state law, possess to sit in admiralty.

Fourth and finally, applying domestic rather than foreign law in determining subject-matter jurisdiction advances the national policy goals of the Constitution's grant of admiralty jurisdiction to federal courts: the "advantages resulting to the commerce and navigation of the United States." DeLovio v. Boit, 7 F. Cas. 418, 443 (C.C.D. Mass. 1815) (No. 3776) (Story, J.); see also Sisson v. Ruby, 497 U.S. 358, 367 (1990) ("The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce . . . .") (internal quotation marks omitted). This is because, in determining what counts as advancing the United States' maritime interests, we must by necessity refer to our own conception of what counts as "maritime"; after all, "we have a maritime law of our own." The Lottawanna, 88 U.S. 558, 574 (1874). Although this particular contract is between two non-U.S. parties engaging in a private financial transaction, the United States still has an interest in providing a forum for this type of contract, especially since

U.S. parties to a similar arrangement would benefit from being able to seek enforcement.

Appellant argues that international comity requires us to use foreign law to determine subject-matter jurisdiction. See Appellant's Br. at 18 & n.6. It notes that, in the interests of international comity, federal courts exercise admiralty jurisdiction over judgments issued by foreign tribunals sitting in admiralty, even if the judgments would not otherwise be treated as maritime under U.S. law. See Int'l Sea Food Ltd. v. M/V Campeche, 566 F.2d 482, 485 (5th Cir. 1978); see also Vitol, S.A. v. Primrose Shipping Co., 708 F.3d 527, 536 & n.4 (4th Cir. 2013).

Appellant would have us extend this rule and declare that federal courts must refuse to assert admiralty jurisdiction over contracts or judgments characterized as non-maritime by their rendering forums. Neither logic nor comity dictates this result. Just because we accept the foreign characterization of a dispute for the purpose of exercising admiralty jurisdiction -- a jurisdictional expansion -- does not mean that we must also accept it for the purpose of refusing to hear a case in admiralty -- a jurisdictional contraction. The former accommodation is supported by considerations of international comity; the latter is not.

Comity is satisfied as long as one court enforces the judgment of another court. Thus, it should not matter to the rendering court under what technical head of jurisdiction its judgment is ultimately enforced, at least where, as here, there is no indication that the rendering forum intended its judgment to be effectuated in only a particular way. See D'Amico, 2014 WL 2609648, at *8. It is hard to fathom the British High Court of Justice caring what jurisdictional subclause of Article III, Section 2 the federal court invokes to enforce the judgment. It should be enough that a plaintiff in possession of a favorable English judgment is given the maximum constitutionally permissible freedom to choose his preferred forum -- here, a federal court sitting in admiralty. If anything, such a rule enhances, rather than diminishes, comity. It may also make it easier for U.S. parties to enforce contracts such as the one here in foreign maritime courts.

To be sure, foreign law is not irrelevant to the determination of whether federal admiralty jurisdiction exists. The status of the contract or judgment under foreign law informs the inquiry in important ways. The question of whether a legal issue is maritime in nature is not an exercise in logic chopping wholly internal to the conceptual schemas of American jurisprudence; instead, it asks whether, as a practical matter, the "principal objective of [the] contract is maritime

32

commerce." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 25 (2004). The reasoned judgments of experienced jurists, foreign or domestic, on this issue are due respectful consideration by federal courts. Additionally, whether other countries characterize a contract as maritime might have collateral consequences that may affect its real-world impact on maritime commerce -- for example, in terms of how the contract is interpreted overseas or what procedures its interpretations are afforded.

Nevertheless, the ultimate question of whether a contract or judgment is maritime for the purpose of supporting federal admiralty jurisdiction must, for the reasons explained above, be answered by reference to domestic rather than foreign law. While foreign law may or may not be instructive under the circumstances, it cannot determine the subject matter jurisdiction of an American court. And, as ably demonstrated in Judge Agee's majority opinion, the contract here has a "genuinely salty flavor." Kossick v. United Fruit Co., 365 U.S. 731, 742 (1961). Thus, federal admiralty jurisdiction properly lies.

33