**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-2267**

FLAME S.A.; GLORY WEALTH SHIPPING PTE LTD.,

        Plaintiffs - Appellees,

    and

VITOL, S.A.,

        Party-in-Interest,

NOBLE CHARTERING INCORPORATED,

        Intervenor/Plaintiff,

    v.

FREIGHT BULK PTE. LTD.,

        Defendant - Appellant,

    and

INDUSTRIAL CARRIERS, INC.; VISTA SHIPPING, INC.; VIKTOR BARANSKIY,

        Defendants.

**No. 15-1120**

FLAME S.A.; GLORY WEALTH SHIPPING PTE LTD.,

        Plaintiffs - Appellees,

    and

VITOL, S.A.,

        Party-in-Interest,

NOBLE CHARTERING INCORPORATED,

        Intervenor/Plaintiff,

     v.

FREIGHT BULK PTE. LTD.,

        Defendant - Appellant,

    and

INDUSTRIAL CARRIERS, INC.; VISTA SHIPPING, INC.; VIKTOR BARANSKIY,

        Defendants.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.    Robert G. Doumar, Senior District Judge.    (2:13-cv-00658-RGD-LRL; 2:13-cv-00704-RGD-LRL)

---

Argued: September 17, 2015        Decided: November 24, 2015

---

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

---

Affirmed by published opinion.   Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

---

**ARGUED:** Anthony J. Franze, ARNOLD & PORTER LLP, Washington, D.C., for Appellant.   William Robert Bennett, III, BLANK ROME LLP, New York, New York; James H. Power, HOLLAND & KNIGHT LLP, New York, New York, for Appellees.   **ON BRIEF:** Andrew G. McBride, WILEY REIN LLP, Washington, D.C.; John N. Nassikas III, R. Stanton Jones, Daniel F. Jacobson, ARNOLD & PORTER LLP, Washington, D.C., for Appellant.   Thomas H. Belknap, Jr., Alan M. Weigel, Lauren B. Wilgus, Nicholas R. Tambone, BLANK ROME LLP, New York, New York, for Appellee Flame S.A.   Robert T.

Hicks, Samuel Spital, Michael J. Frevola, Marie E. Larsen, Stosh Silivos, HOLLAND & KNIGHT LLP, New York, New York, for Appellee Glory Wealth Shipping PTE LTD.

———————————

AGEE, Circuit Judge:

Industrial Carriers, Inc., ("ICI"), a defunct maritime shipping company, breached numerous contracts in the final months of its operation. Among ICI's creditors were FLAME S.A. ("Flame"), who obtained a foreign judgment against ICI for breach of four Forward Freight Swap Agreements ("FFAs"), and Glory Wealth Shipping Pte. Ltd. ("Glory Wealth"), who obtained a foreign arbitration award against ICI based on the breach of a charter party.

Both Flame and Glory Wealth sought a writ of maritime attachment under Supplemental Rule B of the Federal Rules of Civil Procedure to attach the vessel M/V CAPE VIEWER when it docked in Norfolk, Virginia. Freight Bulk Pte. Ltd. ("Freight Bulk") is the registered owner of the vessel, but Flame and Glory Wealth asserted that Freight Bulk was the alter ego of ICI, and that ICI had fraudulently conveyed its assets to Freight Bulk in order to evade its creditors. For that reason, they argued that the U.S. District Court for the Eastern District of Virginia could enforce their claims against ICI through Freight Bulk. Following a bench trial, the district court awarded judgment to Flame and Glory Wealth, ordered the sale of the M/V CAPE VIEWER, and confirmed the distribution of the sale proceeds to Flame and Glory Wealth.

4

Freight Bulk now appeals.  Finding no merit to its claims, we affirm the judgment of the district court.

I.

A.

In 2008, Flame entered into four FFAs with ICI.  After ICI defaulted on those contracts, Flame sued ICI in the High Court of Justice, Queen's Bench Division, Commercial Court, in London, England, alleging the breach and seeking monetary damages.  The English court awarded judgment to Flame in the amount of $19,907,118.36 ("Flame's English judgment").

Flame had the English judgment recognized in the U.S. District Court for the Southern District of New York, and later registered the judgment in the U.S. District Court for the Eastern District of Virginia.  It then sought and obtained the order of attachment against the M/V CAPE VIEWER.

Freight Bulk moved to vacate the order of attachment, contending the district court lacked subject matter jurisdiction because under either United States (federal) or English law, the FFAs were not maritime contracts.  The district court denied Freight Bulk's motion and concluded it had admiralty jurisdiction, but certified the issue for interlocutory appeal. We granted Freight Bulk permission to file an interlocutory appeal.

We then held that federal law governed our jurisdictional inquiry, and that the FFAs were maritime contracts under federal admiralty law. Flame S.A. v. Freight Bulk Pte. Ltd., 762 F.3d 352 (4th Cir. 2014) (the "Interlocutory Appeal"). Because the FFAs were maritime contracts, we concluded that "the district court had subject matter jurisdiction to adjudicate the matter before it." Id. at 363. We remanded the case to the district court for further proceedings.

B.

Separately, but also in 2008, Glory Wealth contracted for ICI to charter a vessel. After three installments, ICI stopped making payments under this agreement. Glory Wealth pursued arbitration against ICI in England and won an arbitration award (Glory Wealth's "English arbitration award"). Subsequently, Glory Wealth sought and obtained recognition of the arbitration award in the Southern District of New York. It did not register that judgment in the Eastern District of Virginia. Instead, Glory Wealth filed a complaint in the Eastern District of Virginia alleging that it was an ICI creditor who could maintain a maritime claim against ICI for breach of a charter party, as established by its English arbitration award.[1] It then sought

---

[1] Glory Wealth represented to the district court that it was in the process of having its English arbitration award reduced to a judgment in England.

6

and obtained an attachment order for the M/V CAPE VIEWER pursuant to Supplemental Rule B.

C.

While the Interlocutory Appeal in Flame's case was pending, the district court consolidated the Flame and Glory Wealth cases based on the common questions of law and fact. Both complaints named other defendants in addition to Freight Bulk and ICI. One such co-defendant was the beneficial owner of Freight Bulk, Viktor Baranskiy, who is the son of ICI's final Chairman of the Board of Directors. Baranskiy is also the sole, beneficial owner of co-defendant Vista Shipping Ltd. ("Vista"). In fact, Baranskiy is the sole owner of numerous maritime companies — now, collectively known as the Palmira Group — of which Freight Bulk and Vista are just two.

The basic theory underlying both complaints was that Baranskiy aided ICI in evading its creditors by funneling money and other assets into multiple entities he controlled, including Vista and Freight Bulk. Vista was formed in late 2008, around the same time as ICI's failure. Freight Bulk, on the other hand, was not formed until several years later. Consequently, the complaints relied on the interconnectedness of ICI with Vista and Vista with Freight Bulk to establish the requisite link showing Freight Bulk's responsibility as an alter ego for ICI's debts. The complaints alleged that Vista and Freight Bulk

7

were both formed with funds that originated from ICI and that ICI fraudulently transferred those funds and other assets in order to avoid its creditors.

The district court, with the assistance of a magistrate judge, oversaw "many, many" motions during discovery. Flame S.A. v. Indus. Carriers, Inc., 39 F. Supp. 3d 769, 771 (E.D. Va. 2014). Freight Bulk repeatedly sought to delay the proceedings by obfuscation, often challenging the meaning and scope of discovery orders with meritless claims. As a result of Freight Bulk's noncompliance, Flame and Glory Wealth obtained sanctions in the form of certain presumptions to be applied at trial.

The evidence adduced at trial and the district court's factual findings are discussed below in the context of Freight Bulk's sufficiency challenge. But as background to our review, we note that things did not bode well for Freight Bulk when, by the end of the first day of his testimony, Baranskiy had provided inconsistent and evasive explanations for many of the key relationships and transactions at issue in the case. Even so, the district court expressed its surprise when Baranskiy and Freight Bulk's lead trial attorney "abandoned the case on the second morning of his testimony by not appearing" and instead left the country. Id. at 776. Local counsel notified the court of Baranskiy and lead counsel's decision and did not present any further evidence.

8

Flame and Glory Wealth subsequently moved for judgment in their favor, which the district court granted. Id. at 790. In so doing, the court concluded that the evidence demonstrated that ICI, Vista, Freight Bulk, and Baranskiy were alter egos of one another. In addition, it found that ICI fraudulently transferred assets to Vista and related Palmira Group entities to avoid creditors, and that these latter entities had also fraudulently transferred funds to Freight Bulk. Accordingly, it held the defendants jointly and severally liable for ICI's debts, up to the value of the M/V CAPE VIEWER.[2] The court ordered the sale of the vessel, and later confirmed the sale and ordered distribution of the sale proceeds between Flame and Glory Wealth under a formula to which they had agreed.

Freight Bulk noted a timely appeal and we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

---

[2] The liability finding was limited in this manner because attachment proceedings under Supplemental Rule B confers only quasi in rem jurisdiction, which limits personal jurisdiction over the defendants in the case to the value of the attached vessel. See Supplemental Rule B(1)(a); Vitol, S.A. v. Primerose Shipping Co. Ltd., 708 F.3d 527, 540 (4th Cir. 2013). Flame and Glory Wealth had also sought to hold the defendants liable for the entire amount of their judgments against ICI, but the district court rejected that argument. Since they did not file a cross-appeal challenging that determination, it is not at issue in this appeal.

9

II.

On appeal, Freight Bulk raises six discrete issues and multiple sub-arguments. While we have reviewed its arguments in detail, we will only address its primary contentions of error. Those are: (1) that under Fourth Circuit precedent, United States substantive law does not apply to this dispute, which means the district court lacked subject matter jurisdiction; (2) that under Supreme Court precedent, actions to shift liability do not state an independent cause of action to establish subject matter jurisdiction, nor can a plaintiff rely on a prior lawsuit's basis for the court's jurisdiction in a subsequent suit to shift liability; (3) that the district court erred in distributing proceeds of the M/V CAPE VIEWER's sale to Glory Wealth because Glory Wealth failed to register its New York default judgment against ICI in the U.S. District Court for the Eastern District of Virginia; (4) that the district court abused its discretion by imposing certain discovery sanctions; (5) that the evidence was insufficient to support the judgment as to both alter ego liability and fraudulent conveyance; and (6) that the district court judge exhibited personal bias against the defendants' Ukrainian nationality, which tainted the entire proceeding and requires a new trial. We address each issue in turn.

## A. Subject Matter Jurisdiction

Freight Bulk raises two new challenges to the district court's subject matter jurisdiction. Although the Court previously determined in the Interlocutory Appeal that the district court possessed admiralty jurisdiction over Flame's claims, the substantive questions we analyzed there are different from the arguments Freight Bulk now presents. Flame and Glory Wealth urge us to hold that the mandate rule precludes our reconsideration of the district court's subject matter jurisdiction.

We have reservations about whether a party can bring serial, piecemeal challenges to the district court's subject matter jurisdiction, and it is certainly a practice we do not encourage. However, we will address the merits of Freight Bulk's new arguments for two reasons. First, neither the Supreme Court nor we have directly opined on how to reconcile the mandate rule with subsequent distinct challenges to the Court's subject matter jurisdiction, a challenge that could ordinarily be raised at any time and even sua sponte. Second, Glory Wealth was not a party to the Interlocutory Appeal.

We review de novo whether the district court had subject matter jurisdiction. See Vitol, 708 F.3d at 533.

11

1.

Relying on Dracos v. Hellenic Lines, Ltd., 762 F.2d 348 (4th Cir. 1985) (en banc), Freight Bulk contends that the district court lacked jurisdiction because the factors governing choice of law set out in Lauritzen v. Larsen, 345 U.S. 571 (1953), point against applying federal law to the parties' dispute. Because neither the parties nor the alleged wrongful conduct had any connection to the United States, Freight Bulk asserts that Dracos requires us to conclude that the district court lacked subject matter jurisdiction.

Many of Freight Bulk's arguments conflate questions of choice of law with questions of subject matter jurisdiction, but our overriding impression is that Freight Bulk simply misunderstands our holding in Dracos. There, the plaintiff brought a negligence claim under the Jones Act and an unseaworthiness claim under general "American Maritime law." 762 F.2d at 350. The plaintiff asserted both tort claims against her deceased husband's employer, the owner of the ship upon which he had died. The plaintiff, her husband, and the defendant were all Greek individuals or corporations. The only connection to the United States was that the plaintiff's husband died while the ship was docked in Norfolk, Virginia. Id. at 350-51.

Applying Lauritzen's choice-of-law analysis, the district court found that federal tort law should not apply to the case, and without a federal claim to decide, the court dismissed the case for lack of jurisdiction.  Id. at 351.  We held that the district court's findings that the defendant's operations and connections to the United States were insufficient to require application of United States law to the plaintiff's claims were not clearly erroneous.  Id. at 352.  As a consequence, we agreed that federal tort law did not govern the plaintiff's claims and that the district court lacked jurisdiction to consider the case.  Id. at 353.

Dracos thus held that when federal law does not provide the basis for a plaintiff's claims against the defendant, the district court is without subject matter jurisdiction.  The court relied on the Lauritzen choice-of-law analysis to determine what law would govern the maritime tort action at issue, which in turn determined whether a federal tort claim existed.[3]  Here, in contrast, Flame and Glory Wealth do not need to look to Lauritzen's choice-of-law analysis to pursue a claim under federal law.  Instead, their claims rest on the long-

---

[3] Glory Wealth argues that Dracos's reference to "jurisdiction" was imprecise and that recent Supreme Court precedent calls into question whether that analysis implicates the district court's subject matter jurisdiction.  We need not address that argument because even a straightforward reading of Dracos does not support Freight Bulk's position.

13

standing recognition that district courts have subject matter jurisdiction in admiralty both to enforce the judgments of foreign admiralty courts, see Vitol, 708 F.3d at 533, 538, and to consider the issues of alter ego and fraudulent transfer as part of an attachment proceeding pursuant to Supplemental Rule B, see id. at 537–38.

In the Interlocutory Appeal, we held that the FFAs between Flame and ICI were maritime contracts, which meant that Flame's claim to enforce its English Judgment by means of a Supplemental Rule B attachment was cognizable under the district court's admiralty jurisdiction. Flame, 762 F.3d at 354–63. None of Freight Bulk's arguments in this appeal challenge that holding, nor would it be able to do so as that holding is the law of the case. Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132, 142 (4th Cir. 2015) (observing that with limited exceptions, once a court has established the law of the case, "it must be followed in all subsequent proceedings in the same case"[4]). Although Glory Wealth seeks to enforce its English arbitration award, its claim against ICI also arose from the breach of an indisputably maritime contract, namely, a charter party. E.g., Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961) ("Without doubt a

---

[4] Here and throughout the opinion, internal quotation marks, citations, alterations, or footnotes have been omitted in citations.

contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction."). Accordingly, Flame and Glory Wealth have claims arising squarely within federal admiralty jurisdiction. See 28 U.S.C. § 1333. At bottom, neither Dracos nor the Lauritzen choice-of-law analysis have any bearing on Flame and Glory Wealth's ability to bring the type of federal action they assert, nor in establishing the district court's admiralty jurisdiction over this case.

2.

Freight Bulk's second jurisdictional challenge is that Peacock v. Thomas, 516 U.S. 349 (1996), "precludes federal jurisdiction over alter ego and fraudulent conveyance claims that seek to shift liability for an existing judgment—including a maritime judgment—onto a non-party to that judgment." (Opening Br. 15.) Freight Bulk contends that Flame and Glory Wealth's allegations of alter ego and fraudulent concealment liability did not independently provide the district court subject matter jurisdiction. In addition, it asserts that the district court could not exercise ancillary, or supplemental, jurisdiction because Peacock prohibits a plaintiff relying on the court's jurisdiction in an earlier lawsuit to establish jurisdiction in a subsequent lawsuit to enforce a judgment.

15

We disagree. Freight Bulk fails to grasp key substantive distinctions between federal question jurisdiction and admiralty jurisdiction when bringing suit to enforce a judgment. In Peacock, the Supreme Court held that the district court lacked jurisdiction to consider a "new action[] in which a federal judgment creditor [sought] to impose liability for a money judgment on a person not otherwise liable for the judgment." 516 U.S. at 351. Because the second action did not allege a new violation of any federal law, the district court did not have original jurisdiction in the second lawsuit pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Id. at 353-54. The Supreme Court also held that the district court did not have supplemental jurisdiction.[5] This was so, the Court concluded, because "[i]n a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks that threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as the claims conferring federal jurisdiction." Id. at 355.

While the plaintiff in Peacock sought to enforce a judgment arising from the court's federal question jurisdiction, Flame

_____

[5] Supplemental jurisdiction, which is sometimes referred to as ancillary jurisdiction, "permit[s] disposition by a single court of claims that are, in varying respects and degrees, factually interdependent" and "enable[s] a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at 354.

16

and Glory Wealth sought to enforce a foreign judgment and arbitration award through the attachment of a vessel by invoking the district court's admiralty jurisdiction. This distinction matters because under long-standing Supreme Court jurisprudence, a district court's admiralty jurisdiction extends to claims to enforce foreign admiralty judgments. See Pennhallow v. Doane Adm'rs, 3 U.S. (3 Dall.) 54, 97 (1795) (opinion of Iredell, J.); see also Vitol, 708 F.3d at 538 (stating "centuries of settled hornbook admiralty law establish that 'admiralty jurisdiction in the United States may be broadly stated as extending to . . . any claim to enforce a judgment of a foreign admiralty court'"); Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998); 1-VII Benedict on Admiralty § 106.

This recognition of subject matter jurisdiction in the admiralty context "differs substantially from the law governing jurisdiction to enforce judgments rendered by federal courts exercising federal question jurisdiction under 28 U.S.C. § 1331." D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 756 F.3d 151, 155 (2d Cir. 2014). While an enforcement action brought under § 1331 must demonstrate the existence of federal jurisdiction independent of the judgment to be enforced, a district court's ability to enforce foreign admiralty judgments has not been so limited. Id. at 155-56 (collecting cases on

17

point).  Similarly, as we reiterated in Vitol, the district court's admiralty jurisdiction includes the inherent authority to grant attachments, including an attachment of assets pursuant to Supplemental Rule B.  See 708 F.3d at 537-38.

Peacock only discussed the requirements of federal question jurisdiction under § 1331 and was unrelated to the scope of a district court's admiralty jurisdiction.  As we have previously recognized in another context, "Peacock does not prohibit a federal court from taking jurisdiction over a postjudgment alter ego claim where an independent basis for jurisdiction exists."  C.F. Trust, Inc. v. First Flight Ltd. P'ship, 306 F.3d 126, 133 (4th Cir. 2002).  Here, that "independent basis" is the court's admiralty jurisdiction.

The Supreme Court's decision in Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684 (1950), confirms our conclusion that because the district court was properly exercising its admiralty jurisdiction, it could also consider the issues of alter ego and fraudulent conveyance.  In Swift, the plaintiff filed suit against a defendant for nondelivery of cargo and attached the defendant's vessel.  The plaintiff later sought to amend its allegations to include a second named defendant, which it argued was either the original defendant's alter ego or an entity to whom the original defendant had fraudulently transferred assets.  Id. at 686.

18

Although the Supreme Court ultimately rejected plaintiff's alter ego claim, it first reiterated that "[t]he jurisdiction of a court of admiralty to determine the question of alter ego is undoubted." Id. at 689 n.4. Thus, under Swift, that "undoubted" authority exists in this case as well.

Swift reached the same conclusion on the issue of fraudulent conveyance. The district court had held (and the Fifth Circuit affirmed) that it could not consider the plaintiff's fraudulent conveyance claim because it ran too far afield from the admiralty claim that provided the basis for the court's jurisdiction. Id. at 689-90. The Supreme Court disagreed, observing that although there are restraints on the exercise of admiralty jurisdiction,

> [The plaintiffs, as creditors of the defendant] went into admiralty on a claim arising upon . . . matters obviously within admiralty jurisdiction. As an incident to that claim, in order to secure respondents' appearance and to insure the fruits of a decree in [their] favor, they made an attachment . . . . The issue of fraud [arose] in connection with the attachment as a means of effectuating a claim incontestably in admiralty. To deny an admiralty court jurisdiction over this subsidiary or derivative issue in a litigation clearly maritime would require an absolute rule that admiralty is rigorously excluded from all contact with nonmaritime transactions and from all equitable relief . . . . It would be strange indeed thus to hobble a legal system that has been so responsive to the practicalities of maritime commerce and so inventive in adapting its jurisdiction to the needs of that commerce.

Id. at 691.

These principles govern this case as well: Flame and Glory Wealth filed enforcement claims that were "obviously within admiralty jurisdiction." Attendant to these claims was the Supplemental Rule B attachment. The issue of fraudulent conveyance arose in connection with those claims. And because the district court's admiralty jurisdiction had been invoked by the Supplemental Rule B attachment, it could also consider the latter.

Freight Bulk points to two cases where circuit courts have applied Peacock in a maritime context. See Nat'l Mar. Servs., Inc. v. Straub, 776 F.3d 783 (11th Cir. 2015); Zamora v. Bodden, 395 F. App'x 118 (5th Cir. 2010) (per curiam) (limiting its analysis to whether federal question jurisdiction exists). Neither is binding, of course, but we also find them unpersuasive to Freight Bulk's position.[6] Significantly, neither

---

[6] In fact, Straub cuts against Freight Bulk's argument with respect to the fraudulent transfer claim because the Eleventh Circuit distinguished Peacock, and concluded it could exercise ancillary jurisdiction in a supplementary proceeding to avoid a fraudulent transfer by a judgment debtor where jurisdiction in the original proceeding had been based in admiralty. See Straub, 776 F.3d at 786-88. This was so because the suit "sought to disgorge [the defendant] of a fraudulently transferred asset, not to impose liability for a judgment on a third party," and liability would be limited to "the proceeds that [the judgment debtor] fraudulently transferred to [the defendant]." Id. at 787. While we need not reach that analysis here since admiralty jurisdiction otherwise exists, Freight Bulk's attempt to distinguish Straub in its favor mischaracterizes that case's holding.

20

case considers whether Peacock applies to an action where an independent basis for establishing the district court's admiralty jurisdiction exists (apart from the fraud or alter ego theories). Nor does either case challenge that the district court's admiralty jurisdiction extends to enforcing foreign admiralty judgments in attachment proceedings.

To reiterate, then, unlike Peacock and the other cases Freight Bulk relies on, Flame and Glory Wealth brought proceedings in the district court to enforce an admiralty judgment and attach a vessel under Supplemental Rule B. The district court had admiralty jurisdiction under § 1333 to determine those claims, and as part of considering those claims, the court also had authority to consider the questions of alter ego and fraudulent conveyance. See 28 U.S.C. § 1367; Vitol, 708 F.3d at 537-39.

Peacock's analysis thus has no bearing on the district court's subject matter jurisdiction over Flame and Glory Wealth's claims. For these reasons, the district court properly exercised jurisdiction over the parties' dispute.[7]

---

[7] Freight Bulk also contends that even if the district court possessed subject matter jurisdiction, the district court erred by adopting Virginia's fraudulent conveyance framework because it is an outlier among state-law provisions. Freight Bulk has not preserved this issue for appeal because it failed to raise it in the district court. As such, we will not consider it for (Continued)

21

B. Glory Wealth's Judgment Against ICI

Next, Freight Bulk contends the district court should not have permitted Glory Wealth to receive a share of the proceeds from the sale of the M/V CAPE VIEWER because Glory Wealth failed to register its New York judgment in the Eastern District of Virginia, "a perquisite to enforce[ment] . . . under 28 U.S.C. § 1963." (Opening Br. 38.) Freight Bulk raises various arguments flowing from this main premise, all of which it asserts require "this Court [to] render judgment for Freight Bulk." (Opening Br. 40.) We need not consider the substance of Freight Bulk's arguments in light of two threshold considerations: waiver and harmlessness.

To start, Freight Bulk never argued to the district court that Glory Wealth's failure to formally submit the judgment it sought to be enforced precluded it from receiving a share of the proceeds from the sale of the M/V CAPE VIEWER. As such, Freight Bulk did not put the district court "on notice as to the substance of the issue" now raised on appeal, as required to preserve it for review. Nelson v. Adams USA, Inc., 529 U.S. 460, 469 (2000).

---

the first time on appeal. In re Under Seal, 749 F.3d 276, 285-86 (4th Cir. 2014).

In addition, the record shows that between the district court's order holding Freight Bulk liable and the sale of the M/V CAPE VIEWER, Freight Bulk never argued that Glory Wealth's failure to formally introduce a judgment against ICI precluded it from recovering a portion of the proceeds. This was so even though the district court explicitly asked Freight Bulk if it had any objections to the distribution. At that time, Freight Bulk only expressed a somewhat indifferent concern that it did not know the basis for the agreed-upon allocation between Glory Wealth and Flame. We have refused to consider newly raised arguments absent "exceptional circumstances," that is to say, a "'fundamental error' or a denial of fundamental justice." In re Under Seal, 749 F.3d at 285-86. No exceptional circumstances exist in this case.

Another consideration demonstrates the absence of any such fundamental injustice and stands as an alternative basis to reject Freight Bulk's argument. Even assuming error, Freight Bulk would not be entitled to any relief as a consequence of Glory Wealth's failure to formally file its judgment. This is so because Flame registered an enforceable judgment in the district court against Freight Bulk in the amount of $19,907,118.36. That judgment far exceeds the approximately $8.3 million in proceeds arising from the sale of the M/V CAPE VIEWER. Flame's claim thus precluded Freight Bulk from any

23

portion of the proceeds from the sale. Prior to distribution of the proceeds, however, Flame and Glory Wealth mutually agreed how to divide the proceeds between themselves, and the district court entered judgment based on that agreement. Freight Bulk thus has no interest in how they resolved their competing claims. It has not been harmed by the alleged error, nor has it shown that it would be entitled to any relief as a result. See 28 U.S.C. § 2111 (stating the court will not consider harmless errors); Fed. R. Civ. P. 61 (same). Accordingly, we decline to consider the substance of Freight Bulk's argument.[8]

### C. Discovery Sanctions

After finding that Freight Bulk had violated several of the court's discovery orders, the magistrate judge issued certain sanctions. Freight Bulk challenges only one of the findings and resulting sanctions: the failure to produce responsive ICI documents.[9] As a consequence of that violation, the magistrate

---

[8] In light of our conclusion, we deny Glory Wealth's motion to supplement the record with the English judgment enforcing the arbitration award that it obtained after final judgment had been obtained in this proceeding.

[9] The district court also found that Freight Bulk had violated discovery orders by failing to produce (1) employee workbooks, (2) responsive emails from Baranskiy's account, (3) documents relating to a loan agreement between Sea Traffic and Freight Bulk, and (4) responsive email attachments. As a consequence, it authorized a sanction in the form of deeming the following facts established for purposes of the case: (1) Freight Bulk and Vista were alter egos of each other, and (2) the loan from Sea Traffic to Freight Bulk was a sham transaction (Continued)

24

judge deemed "as established for purposes of" the proceedings, that "had any [ICI] documents been produced by [Freight Bulk] in compliance with the Court's discovery orders, those documents would have been favorable to [Flame and Glory Wealth] and harmful to [Freight Bulk]." (J.A. 1323.) The district court overruled Freight Bulk's objections, agreeing that Freight Bulk controlled responsive ICI documents and yet had failed to produce them, and that the sanction was appropriate. (J.A. 1762-66, 1778-79.)

Freight Bulk contends this discovery sanction was improper because it did not possess, control, or have custody of responsive ICI documents and thus should not have been compelled to produce them. It also attacks the scope of the discovery order as being too broad. Freight Bulk further asserts that the sanctions "were overwhelmingly prejudicial" given that the district court repeatedly referred to the sanctions to "fill wide gaps" in the trial evidence. (Opening Br. 46.)[10]

---

and Freight Bulk was prohibited from offering evidence of repayment. In addition, the court held Freight Bulk and its counsel jointly and severally liable for attorneys' fees and expenses in pursuing the motions for sanctions.

[10] Freight Bulk's Opening Brief mentions one other discovery sanction in passing (deeming Freight Bulk and Vista to be alter egos). (Opening Br. 41.) Since the alter ego sanction was approved due to "the magnitude of [Freight Bulk's discovery] violations," (J.A. 1777), it was arguably based, at least in part, on Freight Bulk's failure to produce ICI documents. But (Continued)

25

We typically review the substance of a district court's decision to impose discovery sanctions for abuse of discretion. Hoyle v. Freightliner, LLC, 650 F.3d 321, 329 (4th Cir. 2011). We are also obligated, however, to "disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61; see also McNanama v. Lukhard, 616 F.2d 727, 730 (4th Cir. 1980) (concluding error in compelling discovery was harmless); Tagupa v. Bd. of Dirs., 633 F.2d 1309, 1312 (9th Cir. 1980) ("The harmless error doctrine applies to discovery orders.").

We need not wade into the nuances of Freight Bulk's arguments because we readily conclude on this record that even if the district court abused its discretion on this issue, its error was harmless. Freight Bulk markedly overstates the impact that this discovery order and resulting sanction had on the district court's consideration of the case as a whole. Although

---

since the failure to produce ICI documents was just one of five discrete categories of discovery violations leading to this sanction, it likely would have still been an appropriate exercise of the district court's discretion to have imposed it based on the other violations. In addition, Freight Bulk has failed to develop any argument in its opening brief discussing the propriety of this particular sanction. Its analysis solely involves the ICI documents. As such, Freight Bulk has not adequately developed any additional issues related to the propriety of the alter ego sanction for us to review on appeal. See Fed. R. App. P. 28(a)(8)(A); see also Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

26

the negative inference from the ICI documents informed some of the factual findings underpinning the district court's analysis, each factual finding that noted the negative inference was supported by more than one piece of additional evidence that had been admitted at trial.[11]   Moreover, by the time the court explained its legal conclusions as to each of the claims, it had so cabined the negative inference about the ICI documents that this evidence was only one of many facts supporting its analysis.  See Flame, 39 F. Supp. 3d at 787-89.

More problematic, Freight Bulk's argument disregards the effect of the other negative inferences the district court relied on throughout its opinion and which arose from a key aspect of the trial: Baranskiy and his lead counsel's decision to abandon their case mid-trial.  The district court identified that event as "[p]erhaps [the] most important in [the] case," observing that Baranskiy's testimony to that point had been "at times false, inaccurate, contradictory, and untruthful."  Id. at 776.  The district court concluded that Baranskiy's "desertion" prejudiced Flame and Glory Wealth, and found that had Baranskiy

---

[11] For example, although the district court noted the non-production of ICI documents showing when it became insolvent, testimony at trial supported an insolvency "as early as June 30, 2008" and "no later than mid-September," which also allowed the district court to make its ultimate finding "that ICI's insolvency began in July 2008 and continued through October 2008 and thereafter."  Flame, 39 F. Supp. 3d at 777.

27

continued to testify, "his testimony would have been substantially against his own interests in relation to" Vista, Freight Bulk, and ICI. Id. The district court then relied on that negative inference throughout its factual findings and legal analysis. E.g., id. at 778, 779, 787-88, and 789. By the district court's own indication, these negative inferences were considerably more damaging to Freight Bulk than the negative inference created by the document discovery violation contested on appeal.

Based on the totality of the record, even if we assume that the district court erred in sanctioning Freight Bulk for failing to produce ICI documents, that error did not substantially affect the judgment. See Taylor v. Va. Union Univ., 193 F.3d 219, 235 (4th Cir. 1999) (en banc) ("In order to conclude the district court's assumed evidentiary errors did not affect [the judgment], and therefore were harmless, 'we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s].'"), abrogated on other grounds by, Desert Palace Inc. v. Costa, 539 U.S. 90 (2003). Accordingly, we reject Freight Bulk's claim of error.

D. Sufficiency of the Evidence

Freight Bulk next claims the evidence is insufficient to support the judgment in favor of Flame and Glory Wealth. It contends that the hallmarks for establishing alter ego liability are missing as between ICI, Vista, and Freight Bulk.[12] Freight Bulk further posits that the evidence did not establish the requisite fraud to support the fraudulent conveyance claim, but rather reflected legitimate business transactions. Neither argument has merit.

When evaluating the sufficiency of the evidence after a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 427 (4th Cir. 2010).

1. Alter Ego

Although the corporate form ordinarily prohibits one entity from being liable for the acts of a separate, though related, entity, courts will pierce the corporate veil in "extraordinary circumstances," such as when the corporate form is being used for wrongful purposes. Vitol, 708 F.3d at 543-44. The standard for piercing the corporate veil is high, but its purpose is to

---

[12] As noted above, the alter ego analysis here is a two-step process showing Vista operated as an alter ego of ICI and that Freight Bulk is an alter ego of Vista.

29

"achieve an equitable result" by "focus[ing] on reality and not form, on how the corporation operated and the individual defendant's relationship to that operation." Id.[13]

Freight Bulk first contends that the district court erred in holding that ICI and Vista were alter egos. It points to the alter ego analysis in Vitol – wherein we concluded the evidence was insufficient to allege an alter ego claim – and maintains that certain allegations here were identical to, and in some cases less than, the allegations in Vitol. However, because numerous factors can support the conclusion that corporations are alter egos, the inquiry is fact-intensive and specific facts may be relevant in one case and irrelevant in another. See Ost-West-Handel, 160 F.3d at 174 ("Such a determination is to be made on a case-by-case basis."). To that end, Freight Bulk's focus on how the factors in this case align with those in Vitol is misplaced. The relevant inquiry is not whether any particular factor was present, but whether the totality of the evidence established during the trial demonstrated that ICI and Vista were alter egos of each other.

---

[13] The parties do not dispute that federal common law applies to this analysis. See Ost-West-Handel, 160 F.3d at 174 ("[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point.").

On that point, the district court applied the proper legal standards, relied on factors we have previously identified as relevant, and concluded that the evidence supported an alter ego finding. The factors considered by the district court included ICI's insolvency; Baranskiy's siphoning of funds; the failure of ICI, Vista, and Palmira Group companies to observe corporate formalities and maintain corporate records; that Baranskiy controlled the acts of specific Vista officers as well as Vista and Palmira Group companies as a whole; and that ICI and Vista had some shared ownership and employees. See Vitol, 708 F.3d at 544 (listing these factors as indicative of alter ego corporations).

Freight Bulk does not dispute most of these factual findings, and the few it does challenge were not clearly erroneous. For example, Freight Bulk points to Baranskiy's trial testimony to assert that ICI and Vista had only a negligible overlap in employees. But the district court did not find Baranskiy's testimony to be credible. Flame, 39 F. Supp. 3d at 776. Moreover, the district court's finding that ICI and Vista "shared the same employees performing substantially the same tasks" relied on four named management employees plus unnamed "others." Id. at 780. As the court's analysis reflects, the significant factor underpinning its finding on this point was not the percentage of overall shared employees,

31

but rather their roles and fluidity between ICI, Vista, and the other Palmira Group affiliates (including Freight Bulk). Id. This finding was an appropriate one to make under the record evidence and to be considered as part of the district court's alter ego analysis.

Similarly, Freight Bulk asserts the district court errantly found that Baranskiy's "working at [his] father's company [made him ICI's] alter ego." (Opening Br. 49.) Yet again, Freight Bulk mischaracterizes the basis for the district court's finding, which was not based on Baranskiy's status as an employee of both ICI and Vista. Instead, the court's conclusion followed a detailed explanation of Baranskiy's specific conduct as a conduit for cash between ICI and Vista. See Flame, 39 F. Supp. 3d at 776-83.

Freight Bulk also challenges the second step of the district court's analysis – i.e., its conclusion that Freight Bulk and Vista were alter egos. Freight Bulk contends that "as a matter of law" they are not. (Opening Br. 50.) We reject this argument for two reasons, either of which would be sufficient on its own. First, one of the sanctions for Freight Bulk's cumulative discovery violations was the finding that Freight Bulk and Vista are "alter egos of one another." Id. at 773. For the reasons discussed in footnote 10, that sanction stands. As such, the district court could properly rely on it

32

at trial.  See Fed. R. Civ. P. 37(b)(2)(A)(i) (stating that a proper sanction for discovery violations is "directing that . . . designated facts be taken as established for purposes of the action").

Second, and quite apart from the sanction-based finding, the evidence fully supports the district court's conclusion. The trial record established, among other things, Baranskiy's ownership and control of both entities; that officers do as Baranskiy directs rather than exercising independent decision making; that Freight Bulk is undercapitalized; that funds between Freight Bulk and Vista are intermingled amongst themselves and other Palmira Group entities; that Baranskiy's companies fail to observe corporate formalities and maintain proper records; that they share office space; and that dealings are not conducted at arm's length.

Freight Bulk's limited challenges to these findings again minimize Baranskiy's conduct and attack the court's findings as being based solely on his ownership of both Freight Bulk and Vista.  Certainly not all corporations with a common owner are alter egos, but neither can a corporation escape alter ego liability solely on the basis of being a separate, formal entity sharing the same owner.  Where, as here, the evidence shows a common owner who fails to observe corporate formalities and often comingles funds to avoid legal obligations, it is not

33

error to treat the entities as one. E.g., De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 685 (4th Cir. 1976) ("[T]he mere fact that all or almost all of the corporate stock is owned by one individual . . . will not afford sufficient grounds for disregarding corporateness. But when substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced 'little difficulty' and have shown no hesitancy in applying what is described as the 'alter ego' or 'instrumentality' theory in order to cast aside the corporate shield[.]").

Freight Bulk also mistakenly asserts that it cannot, as a matter of law, have been ICI's alter ego because it was established years after ICI's demise. This argument overlooks the requisite causal link between the entities through Vista. Freight Bulk does not deny that ICI and Vista were in existence at the same time. Since those two entities were alter egos, they are liable for each other's debts. See Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 65 (4th Cir. 1989) (describing the effect of piercing the corporate veil). Similarly, because Vista and Freight Bulk are alter egos, they can be responsible

34

for each other's debts.[14]  In short, Freight Bulk is liable for ICI's liabilities through Vista.

The district court properly applied our case law regarding alter ego liability to the facts presented.  Our conclusion in a prior case applies equally here: "[T]his case patently presents a blending of the very factors which courts have regarded as justifying a disregard of the corporate entity in furtherance of basic and fundamental fairness."  Keffer, 872 F.2d at 65.

## 2.  Fraudulent Conveyance

Freight Bulk also raises multiple challenges to the district court's conclusion that ICI fraudulently conveyed assets to the defendants and related entities to avoid its creditors.  Given no federal admiralty rules govern such a claim, the district court appropriately looked to Virginia law. See Ost-West-Handel, 160 F.3d at 174; see also supra n.7 (observing that Freight Bulk failed to preserve any argument that the district court should not have looked to Virginia

---

[14] As part of its argument, Freight Bulk selectively characterizes the Supreme Court's statement in Swift that the plaintiff could not pursue alter ego liability against a particular defendant since it came into existence after the underlying cause of action accrued. Significantly, however, the Supreme Court noted that "apart from any transfer of assets by [the originating defendant to an alleged alter ego company], the latter company could not be held personally liable on an alter ego theory."  Swift, 339 U.S. at 689 n.4 (emphasis added). Here, Flame and Glory Wealth alleged a transfer of assets, so that principle does not apply.

35

fraudulent transfer principles). The applicable Virginia statute treats as void any transfer of property "given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to[.]" Va. Code § 55-80.

"In a suit to set aside a fraudulent conveyance, proof of the fraudulent intent must be 'clear, cogent and convincing.'" Fox Rest Assocs., L.P. v. Little, 717 S.E.2d 126, 132 (Va. 2011). However, because of the difficulty of establishing fraudulent intent, Virginia courts have traditionally relied on certain presumptions, known as "badges of fraud." Id. These "badges of fraud" include: the relationship of the parties, the grantor's insolvency, pursuit of the grantor by creditors at the time of the transfer, want of consideration, retention of the property by the grantor, fraudulent incurrence of indebtedness after the conveyance, gross inadequacy of price, and lack of security. Id. at 131-32; 9A Michie's Jurisprudence of Virginia & West Virginia §§ 12, 15 (2015). "Once a party has introduced evidence to establish a badge of fraud, a prima facie case of fraudulent conveyance is established[, and] the burden shifts [so that] the defendant must establish the bona fides of the transaction." Fox Rest Assocs., 717 S.E.2d at 132.

At the outset, Freight Bulk asserts the district court inappropriately relied on adverse inferences in the absence of

36

evidence supporting Flame and Glory Wealth's claim. While Freight Bulk refers to "adverse inferences" in the plural, we note again that its prior challenge was only to the negative inference drawn from the failure to produce ICI documents, not from the district court's additional inferences arising from Baranskiy's trial conduct. Plus, we have already held that any error on this front was harmless. As to the inference arising from trial, the district court acted within its discretion in finding that any additional testimony from Baranskiy "would have been detrimental to [Freight Bulk's] positions." Flame, 39 F. Supp. 3d at 789; see also Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (noting, in the context of the Fifth Amendment's privilege against self-incrimination, that a court may draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); Brice v. Nkaru, 220 F.3d 233, 240 & n.9 (4th Cir. 2000) (discussing limitations on when an adverse inference can be made in a civil trial as a result of an opposing party's failure to testify or missing testimony, none of which are applicable here); Streber v. Comm'r, 138 F.3d 216, 221-22 (5th Cir. 1998) ("In general, a court may draw a negative inference from a party's failure to produce a witness 'whose testimony would elucidate the transaction.'" (quoting Graves v. United States, 150 U.S. 118, 121 (1893)).

37

Next, Freight Bulk contends the evidence did not show that ICI transferred the charter for the M/V HARMONY FALCON to Vista, but rather that Vista simply entered into its own charter after ICI went bankrupt. The district court ably described the record evidence supporting its finding to the contrary. That evidence included proof that ICI and Vista both hid Vista's assumption of the charter; that Vista "paid [the] same charter rate for the same ship and route and cargo [as ICI had contracted for] despite the drop in shipping rates which [had] occurred"; that a subsidiary of ICI paid bunker rates for the charter Vista fulfilled; that Vista did not give ICI any consideration for the transaction; and that Vista "made about $1.7 million profit for the charter of the HARMONY FALCON, which sum ICI would have been entitled" to collect and apply to its debts. Flame, 39 F. Supp. 3d at 777-78. As the district court concluded, these facts are the very badges of fraud Virginia courts have indicated give rise to a prima facie case of fraudulent transfer. Id. at 785, 789. And Freight Bulk failed to rebut that presumption with evidence establishing the bona fides of the transaction.

Freight Bulk also contends Flame and Glory Wealth failed to establish fraud with respect to $1.58 million in payments ICI made to Baranskiy that it claims were commissions. The document Freight Bulk points to as proof for this position is an untitled, undated sheet of paper containing columns listing

clients and corresponding numbers without any context. We cannot say on the basis of this document that the district court clearly erred in rejecting Freight Bulk's assertion as to its meaning, particularly given the lack of credible corroborating testimony. Indeed, Baranskiy's testimony was contradictory throughout the duration of the case, including with respect to explaining money he received from ICI and money he used to capitalize Vista. As such, the district court did not clearly err in finding that these payments were actually payments ICI made to capitalize Vista.

As a final argument, Freight Bulk asserts that, at most, Flame and Glory Wealth established two discrete fraudulent transfers (the M/V HARMONY FALCON charter and $1.58 million cash) totaling only $3.28 million. As such, it contends the district court erred in holding that Freight Bulk was liable for the total amount of Flame and Glory Wealth's judgments against ICI, which were in the neighborhood of $60 million. Relatedly, Freight Bulk asserts that the district court should have capped Flame and Glory Wealth's recovery at $3.28 million rather than distributing the entire $8.3 million obtained from the sale of the M/V CAPE VIEWER.

This argument fails for two reasons. First, alter ego liability made Freight Bulk jointly and severally liable for the entirety of Flame and Glory Wealth's judgments against ICI.

39

Thus, even if Freight Bulk were correct as to the fraudulent conveyance claim, it would still not be entitled to a different result because of the district court's judgment on that issue. Swift, 339 U.S. at 689 n.4 (observing that if plaintiffs succeeded on a theory of alter ego, then the issue of fraudulent transfer would be irrelevant because they would be afforded relief under those standards). Second, the premise of Freight Bulk's argument - that the district court only found two fraudulent conveyances - is incorrect. To the contrary, the district court found multiple fraudulent conveyances between ICI's alter egos, making Freight Bulk liable for the entire fraud perpetrated by ICI through Baranskiy and his compatriots. While its holding identified the charter of the M/V HARMONY FALCON in particular, it also identified the transfer of other "assets," "substantial funds," and "ostensible 'loans,' which are in reality security—and interest-free transfers of funds[.]" Flame, 39 F. Supp. 3d at 789. In addition, the district court relied on the discovery sanction – unchallenged on appeal – that Vista provided funds to Sea Traffic, which were "then transferred to [Freight Bulk] for the purchase of the CAPE VIEWER," in a "sham transaction used to avoid creditors." Id. at 781.

For these reasons, we conclude sufficient evidence supports the judgment against Freight Bulk on the fraudulent conveyance claim.

## E. Judicial Bias

Lastly, Freight Bulk contends the district court demonstrated a personal bias against Ukrainians, which tainted the entire proceeding and requires reversal.[15] In support, Freight Bulk points to nine statements by the district court that purportedly show this prejudice.

To be sure, "[a] fair trial in a fair tribunal is a basic requirement of due process." Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876 (2009). To protect the right to be heard by an impartial jurist, Congress has authorized parties to timely file an "affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party," and upon such a showing, "such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." 28 U.S.C. § 144. This is, of course, in addition to the judge's own duty to consider whether he must disqualify himself "in any proceeding in which

---

[15] Alternatively, Freight Bulk asserts the district court's bias requires reassignment to a different judge in the event of a remand. Because we have not found any other reversible error, we only consider the remaining portion of Freight Bulk's argument.

41

his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

At no time in the proceedings below did Freight Bulk challenge the district court judge's impartiality to hear the case. Accordingly, it has failed to preserve this claim for appellate review. See In re Under Seal, 749 F.3d at 285-86 (discussing the consequences of failing to preserve a claim for appeal); see also Corti v. Storage Tech. Corp., 304 F.3d 336, 343 (4th Cir. 2002) (Niemeyer, J., concurring) ("[I]t remains the law of this circuit that when a party to a civil action fails to raise a point at trial, that party waives review of the issue unless there are exceptional or extraordinary circumstances justifying review."). Having reviewed Freight Bulk's arguments and paid particular attention to the exemplars it provided in the transcripts, we discern no exceptional or extraordinary circumstances in this case that would justify reviewing it on the merits.[16]

---

[16] Freight Bulk cites an out-of-circuit case to support its view that this Court should not deem its argument waived. See United States v. Kaba, 480 F.3d 152 (2d Cir. 2007). This criminal sentencing case did not involve an allegation of evidence of a judge's personal bias or prejudice, but rather a claim that the judge considered the defendant's nationality in deciding an appropriate sentence. Id. at 156-58. As such, it is inapposite.

Moreover, even assuming Freight Bulk preserved its argument, we find no error. We have reviewed the statements cited by Freight Bulk and conclude it has selectively quoted (Continued)

## III.

For the reasons detailed above, the judgment of the district court in favor of Flame and Glory Wealth is

AFFIRMED.

---

only parts of the record and taken the comments far out of context. Viewed in full, there is nothing in the district court's commentary to support such a claim.