16-3125-cv
*d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2016

(Argued: April 6, 2017          Decided: March 29, 2018)

No. 16-3125-cv

_____

D'AMICO DRY LIMITED,

*Plaintiff-Appellant,*

-v.-

PRIMERA MARITIME (HELLAS) LIMITED AKA Primera Maritime Limited, SONIC FINANCE INC., MIRAGE FINANCE INC., NIKKA FINANCE INCORPORATED, HANDY FINANCE INC., PASHA FINANCE INC., MOVIDA FINANCE INC., ELEMENT FINANCE INC., CALDERA MARINE CO. LTD., ADALIA MARINE CO. LTD., SEASATIN NAVIGATION INC., ANNAMAR NAVIGATION INC., SEASAFE NAVIGATION INC., CHEMNAV INC., PAUL CORONIS, NIKOLAOS CORONIS AKA Nicholas Coronis, PRIMEBULK SHIPMANAGEMENT LTD., PRIMERA OCEAN SERVICES S.A., BULKNAV INC., J.P.C. INVESTMENTS S.A. AKA JPC Investments S.A., CHEMNAV SHIPMANAGEMENT LTD.,

*Defendants-Appellees.*

_____

Before:      KATZMANN, *Chief Judge*, JACOBS and LIVINGSTON, *Circuit Judges*.

Appeal from an August 15, 2016 judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*), dismissing this case, after a bench trial, for lack of subject matter jurisdiction. After obtaining a judgment in an English court against the Defendant-Appellee for failure to tender payment pursuant to a freight-derivative contract, the Plaintiff-Appellant, a shipping company, filed this lawsuit seeking enforcement of the English judgment and asserting admiralty jurisdiction under 28 U.S.C. § 1333(1). The district court held that admiralty jurisdiction did not exist because there was no proof that the Plaintiff-Appellant entered the agreement underlying its claim to hedge the risk that specific vessels in its fleet would be underemployed. Considering the Plaintiff-Appellant's identity as a shipping business together with the substance of the agreement, we conclude that the agreement's principal objective was to further the Plaintiff-Appellant's shipping business. The agreement is therefore a maritime contract subject to federal-court jurisdiction under § 1333(1). Accordingly, the judgment of the district court is VACATED and the case is REMANDED for further proceedings.

THOMAS L. TISDALE, Tisdale Law Offices, LLC, New York, New York, *for Plaintiff-Appellant.*

JOHN J. REILLY, Squire Patton Boggs (US) LLP, New York, New York, *for Defendant-Appellee* Primera Maritime (Hellas) Limited AKA Primera Maritime Limited.

William R. Bennett, III, Blank Rome LLP, New York, New York, *for Defendants-Appellees* Sonic Finance Inc., Mirage Finance Inc., Nikka Finance Incorporated, Handy Finance Inc., Pasha Finance Inc., Movida Finance Inc., Element Finance Inc., Caldera Marine Co. Ltd., Adalia Marine Co. Ltd., Seasatin Navigation Inc., Annamar Navigation Inc., Seasafe Navigation Inc., Chemnav Inc., Paul Coronis, Nikolaos

Coronis AKA Nicholas Coronis, Primebulk Shipmanagement Ltd., Primera Ocean Services S.A., Bulknav Inc., J.P.C. Investments S.A. AKA JPC Investments S.A., Chemnav Shipmanagement Ltd.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Plaintiff-Appellant d'Amico Dry Limited ("d'Amico") is a shipping company and Defendant-Appellee Primera Maritime (Hellas) Limited ("Primera") is a ship management company. In 2008, d'Amico sold a derivative financial instrument known as a forward freight agreement ("FFA") to Primera. Under the FFA, d'Amico was obligated to pay Primera if the mean market rates for shipping on certain types of vessels on certain routes during certain months exceeded an agreed-upon rate. In turn, Primera was obligated to pay d'Amico if the market rate was less than the agreed-upon rate. When Primera failed to pay d'Amico as required under the agreement, d'Amico terminated the FFA and obtained a judgment against Primera in an English court. Then, seeking to enforce the judgment, d'Amico sued Primera and its alleged alter egos and successors-in-interest in the United States District Court for the Southern District of New York. D'Amico asserted subject matter jurisdiction under 28 U.S.C. § 1333(1), which empowers federal district courts to hear admiralty cases. The

3

district court dismissed the case for lack of subject matter jurisdiction because the judgment was rendered by a commercial (not admiralty) court and the underlying claim was nonmaritime under English law. On appeal, this Court vacated the dismissal and remanded for the district court to determine in the first instance whether the underlying claim was maritime under U.S. law.

After a four-day bench trial, the district court again dismissed the case for lack of subject matter jurisdiction. The district court concluded that the agreement between d'Amico and Primera was not a maritime contract falling within § 1333(1)'s jurisdictional grant because d'Amico had not proven it made the agreement to protect against the risk that specific vessels in d'Amico's fleet would be underemployed during the period of the FFA.

On appeal, d'Amico argues that the FFA was a maritime contract because, on the facts found by the district court at trial, the agreement with Primera was a hedge against another risk: d'Amico's exposure to shifts in the market price for shipping on certain routes. We agree: the combination of d'Amico's identity as a market participant with the substance of the agreement establishes that the FFA was part of d'Amico's shipping business. Because the FFA's principal objective was maritime commerce, it is a maritime contract and claims arising from it fall

4

within our admiralty jurisdiction. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23–24 (2004). We therefore VACATE the judgment of the district court and REMAND for proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background[1]

D'Amico, incorporated in Ireland, owns and operates dry bulk shipping vessels. In 2008 and 2009, when the events underlying this lawsuit occurred, d'Amico's fleet included approximately thirty vessels—including ten to twelve "Panamax" vessels. Panamax vessels have the maximum dimensions that can traverse the Panama Canal. They transport commodities such as coal, minerals, and grains to destinations all over the globe. D'Amico owned about half of its fleet, and chartered the rest of its vessels long term. D'Amico employed the vessels it controlled in various ways—in part through long-term time charters, but also on the spot market through single-trip-voyage or short-duration charters.

As a shipping company, d'Amico is exposed to the ebbs and flows of shipping prices, including the risk that the market rate for shipping on a route its

---

[1] Unless otherwise noted, the factual background presented here is derived from the stipulated facts and uncontroverted evidence presented at trial.

vessels ply will sink significantly. According to d'Amico's 2008 Directors' Report, the company used FFAs "to mitigate movements in the 'physical market'" that could harm its business. Joint App'x 739; *see also id.* at 751 (noting that d'Amico "uses derivative financial instruments to partially hedge its exposure to . . . market risks"). An FFA is a contract for the difference between a contract rate and a settlement rate. The contract rate is a rate agreed upon by the parties. The settlement rate is the market rate for freight carried by a certain type of vessel, traveling a certain route (or group of routes), during a certain time period in the future. Because FFAs are not commitments to perform shipping services, any individual or entity (including one with no other tether to maritime commerce) can trade in FFAs. FFAs are traded over the counter rather than on regulated exchanges. In 2008, when the FFA at issue here was made, most FFAs were concluded bilaterally rather than through a clearinghouse, so each party bore the risk that its counterpart would fail to meet its obligations under the contract. There was no general requirement that these transactions be secured, although a prospective trader could request assurances from a potential counterparty.[2]

---

[2] By contrast, today nearly all FFA trades are made through clearinghouses, under circumstances which dramatically reduce counterparty risk.

In September 2008, d'Amico sold an FFA to Primera, a ship management company incorporated in Liberia and operating in Greece ("the d'Amico-Primera FFA"). The d'Amico-Primera FFA covered forty-five days in the first quarter of 2009. The contract rate was $55,750 per day. The FFA was to be settled monthly; the settlement rate was the mean of the daily published Baltic Panamax Index ("BPI") for all days of the pertinent month. The BPI is one of several indices published daily by the Baltic Exchange, a London-based organization that provides maritime market information. The BPI, which is based on reports from independent freight brokers about the freight market's performance, incorporates rates for shipping on standard routes travelled by Panamax carriers. For each month that the settlement rate exceeded the contract rate, d'Amico, as seller, was obligated to pay Primera, as buyer, the difference between the two rates. If instead the contract rate exceeded the settlement rate, Primera would have to pay the difference to d'Amico.

For the first month of the FFA, January 2009, the latter came to pass as the late-2008 financial crisis had sunk freight rates from historic crests in the mid-2000s. When Primera breached by failing to pay the amount due for January 2009, d'Amico terminated the contract and sued Primera in the English High Court

7

of Justice, as provided for in the contract. On June 19, 2009, the English court issued a judgment in favor of d'Amico for $ 1,766,278.54 plus costs.

## II. Procedural History

In September 2009, d'Amico filed this lawsuit against Primera in the United States District Court for the Southern District of New York, seeking enforcement of the English judgment. The following December, d'Amico filed an amended complaint adding several individual and entity defendants, which d'Amico sought to hold liable for the English judgment as Primera's alleged alter egos and successors-in-interest.

In 2011, the defendants moved to dismiss the case for lack of subject matter jurisdiction. The district court granted the motion, holding that it lacked jurisdiction under the principle recognized in *Penhallow v. Doane's Adm'rs*, 3 U.S. (3 Dall.) 54, 97 (1795), which permits admiralty courts to enforce judgments issued by their foreign counterparts. *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, No. 09-cv-7840-JGK, 2011 WL 1239861, at *2–3 (S.D.N.Y. Mar. 28, 2011). According to the district court, *Penhallow* did not apply because the English judgment was neither rendered by an admiralty court nor based on a claim deemed maritime by English law. *Id.* at *3–4. After judgment, d'Amico moved for reconsideration,

arguing the district court had jurisdiction under 28 U.S.C. § 1333 because the d'Amico-Primera FFA was a maritime contract under U.S. law. *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, No. 09-cv-7840-JGK, 2011 WL 3273208, at *4 (S.D.N.Y. Aug. 1, 2011). The district court denied this motion, holding that a judgment enforcement action is separate from the underlying substantive action, and that "a suit to enforce a judgment rendered on a maritime claim is not itself maritime in nature." *Id.*

On appeal, this Court vacated the district court's judgment dismissing the case, holding that "under § 1333, United States courts have jurisdiction to enforce a judgment of a foreign non-admiralty court if the claim underlying that judgment would be deemed maritime under the standards of U.S. law." *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 756 F.3d 151, 153 (2d Cir. 2014). In the absence of binding precedent on the question, we identified "strong theoretical and practical reasons for assessing the maritime nature of the claim under U.S. admiralty standards." *Id.* at 160. On the theoretical side, we emphasized the constitutional (and statutory) policy of allowing U.S. federal courts to hear claims deemed maritime by U.S. law, as well as traditional choice-of-law and international-comity principles. *Id.* at 160–61. On the practical side, we

9

expressed concern about the costly litigation that would result if subject matter jurisdiction turned on the characterization of the claim under foreign law and we emphasized the special need for certainty in light of § 1333's exclusive jurisdictional grant. *Id.* at 161–62. We therefore remanded the case for the district court to determine in the first instance whether "the underlying claim on the FFA is deemed maritime under the standards of U.S. law." *Id.* at 162.

In May 2016, the district court held a four-day bench trial during which it received evidence on the remaining issues in this case, including whether the d'Amico-Primera FFA is a maritime contract under U.S. law.[3] On this point, the district court considered both documentary evidence and testimony from the principals of d'Amico and Primera and an expert witness about d'Amico's purpose for entering the agreement.

D'Amico's witness on this issue was Luciano Bonaso ("Bonaso"), d'Amico's general manager when the d'Amico-Primera FFA was made. In that role, he supervised the arrangement of employment for vessels as well as their

---

[3] The other issues at trial were whether the district court should recognize the English judgment and order interest in accord with English law; if so, whether the non-Primera defendants were liable for the English judgment as alter egos or successors-in-interest of Primera; and whether the district court should enter default judgments against non-appearing defendants alleged to be alter egos or successors-in-interest of Primera.

management and purchase. He maintained spreadsheets to keep track of both the fleet's physical commitments and d'Amico's FFA trades. Bonaso testified that to his best recollection, d'Amico's "intention" for entering the d'Amico-Primera FFA was "to hedge" its physical position "against certain days" in the opening months of 2009. Joint App'x 71. He explained that d'Amico sold an FFA that was to be settled each month against that month's mean BPI because the FFA was made to hedge against risk d'Amico faced in the Panamax segment of its business, on "routes that contribute to the index for the settlement," which "was consistent with the employment for [d'Amico's] spot vessels . . . at the time." *Id.* at 70. Bonaso also testified that in 2008, d'Amico derived approximately "[t]wo to three percent" of its revenue from FFAs, *id.* at 69, and d'Amico was not "speculating in FFAs" although a separate entity, d'Amico Finance, was doing so, *id.* at 75.[4]

---

[4] As discussed *infra*, the district court refused to credit portions of Bonaso's testimony—including, particularly, those concerning d'Amico's purpose for selling the d'Amico-Primera FFA—because there were inconsistencies among Bonaso's testimony and his earlier statements, and because the statements were, in the district court's view, inconsistent with d'Amico's trading behavior. *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 201 F. Supp. 3d 399, 405–07 (S.D.N.Y. 2016). On appeal, d'Amico does not challenge the district court's credibility findings (or, for that matter, any of the district court's factual findings).

11

Primera offered expert testimony from Karina Albers ("Albers"), a consultant in the maritime-freight field as evidence that the d'Amico-Primera FFA was nonmaritime. Albers testified that, based on her experience with the FFA market, d'Amico's FFA trading behavior in 2008 and 2009 did not support the conclusion that it used FFAs to hedge its shipping business.

According to Albers, a vessel owner's FFA qualifies as a hedge only if the owner uses the FFA to protect against the underemployment of specific vessels at specific times. Although she claimed that the specific vessels to be protected by an FFA need not be recorded at the time of the trade for the trade to be a hedge, she admitted that "for . . . an expert to testify" at a later date that the owner was using a specific FFA as a hedge in this particular way, the specific vessels would need to be documented somewhere. Joint App'x 323.

Albers testified that in addition to hedging specific assets, FFAs can be used as a tool for "redistributing market risk" in general. *Id.* at 320. But she also claimed that if a vessel owner sold FFAs because of concern about the risk of a declining market, but "d[id]n't have [a] specific vessel in mind and . . . d[id]n't connect the FFA with [a] specific vessel," then the owner was "speculating,"—not hedging. *Id.* at 323. Albers further acknowledged that "an owner [could] go

12

into an FFA as a hedge and then change his mind," but asserted that when the owner "changes his mind and . . . closes it out, it's not a hedge any longer." *Id.* at 326.

In its post-trial order, the district court acknowledged that the proper inquiry was "whether the 'principal objective' of the contract is the furtherance of maritime commerce." *D'Amico*, 201 F. Supp. 3d at 408 (quoting *Kirby*, 543 U.S. at 25). The district court nonetheless adopted the view that an FFA was a maritime contract only if the FFA was made to hedge against "market risks relating to the employment" of specific vessels. *Id.* at 411. Rejecting Bonaso's testimony about d'Amico's reason for entering the agreement, *id.* at 405–06, and accepting Albers's characterization of d'Amico's trading behavior as speculating rather than hedging, the district court concluded that there was "no credible evidence that" the d'Amico-Primera FFA's "principal objective . . . was to further maritime commerce," *id.* at 412.

The district court rejected as "not credible" Bonaso's testimony about d'Amico's reasons for entering the FFA because, in its view, Bonaso's trial testimony was both "inconsistent" with his previous statements and "belied by the actual facts" of d'Amico's trading behavior. *Id.* at 405. Bonaso's testimony

13

was "inconsistent," in the district court's view, because he had made conflicting statements in his pretrial depositions and declarations. *Id.* at 405–06. For example, Bonaso had incorrectly stated the number of days the d'Amico-Primera FFA concerned. *Id.* at 406. The district court deemed this error "significant" because it undermined Bonaso's claim that "he carefully calculated the number of days that he wanted to cover with an FFA to protect against the underuse of his fleet." *Id.* In a deposition, Bonaso had also underreported the number of FFAs d'Amico had entered into for the first quarter of 2009. *Id.* at 406, 412. According to the court, Bonaso's testimony was "belied by the actual facts" of d'Amico's FFA trading behavior, *id.* at 405, in two ways. First, despite Bonaso's earlier statement in a deposition that d'Amico only sold FFAs, the evidence revealed that d'Amico bought them as well. *Id.* at 412. Second, Bonaso's claim that he intended the d'Amico-Primera FFA to protect against the risk of underemployed vessels was not credible because d'Amico closed its position two days later, securing its earnings at that time and leaving "no financial protection for unemployed or 'underemployed' vessels or any vessels at all in the first quarter of 2009." *Id.* at 407; *see also id.* at 411. Disregarding Bonaso's claims about the purpose behind the d'Amico-Primera FFA, the district court instead credited Albers's testimony

14

that d'Amico's "trading pattern was typical of a derivatives trader" rather than a shipowner "hedging a physical position in the freight market." *Id.* at 412.

Concluding d'Amico had failed to prove the d'Amico-Primera FFA was a maritime contract, the district court held that it lacked federal maritime jurisdiction to enforce the English judgment. *Id.* at 412. Without reaching the remaining issues, the district court dismissed the case. *Id.* D'Amico appealed.

During the pendency of the appeal, on September 14, 2016, Primera sent a letter to d'Amico explaining that Primera believed this appeal to be frivolous, and expressing its intent to move for sanctions if d'Amico failed to withdraw the appeal. D'Amico held fast, and in February 2017 Primera moved for sanctions against d'Amico for purportedly filing a frivolous appeal based on false testimony and distortion of the relevant decisions.[5] D'Amico opposed the request for sanctions. The motion was referred to our panel.

**DISCUSSION**

The district court acknowledged that, under *Kirby*, the appropriate inquiry is whether the principal objective of the agreement is maritime commerce.

---

[5] Primera moved for sanctions pursuant to Federal Rule of Appellate Procedure 38; 28 U.S.C. § 1927; and this Court's inherent power to issue sanctions, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

15

*D'Amico*, 201 F. Supp. 3d at 408 (citing *Kirby*, 543 U.S. at 25). But the court held that, to establish the "principal objective" of the d'Amico-Primera FFA, d'Amico had to prove that its subjective purpose for entering the agreement was to hedge against the underemployment of specific vessels in its fleet. *Id.* at 411.

We review *de novo* "[w]hether a suit falls within federal subject matter jurisdiction," *D'Amico*, 756 F.3d at 155 n.2, and we conclude that the district court conceived of its maritime contract jurisdiction too narrowly. Despite the extensive evidence presented at trial, the essential facts in this case are few: First, d'Amico, a shipping company, sold a freight-derivative valued by reference to freight rates. And, second, the fluctuation of those rates was a risk inherent in d'Amico's shipping operations. Given the alignment between d'Amico's identity and the substance of the agreement, the d'Amico-Primera FFA was plainly made as part of d'Amico's shipping business, and its principal objective is promoting maritime commerce. Because the d'Amico-Primera FFA was a maritime contract, the district court erred by dismissing this case for lack of subject matter jurisdiction.

## I

The U.S. Constitution extends the federal judicial power to "all Cases of admiralty and maritime jurisdiction." Art. III, § 2, cl. 1. By statute, Congress has empowered federal district courts to hear "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). This grant provides for jurisdiction over claims arising from maritime contracts. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 632 (2d Cir. 2016). The resolution of this appeal turns, therefore, on a deceptively simple question: is the d'Amico-Primera FFA a maritime contract?

The question is clear, but the law is murky. There is no "clean line[]" of demarcation "between maritime and nonmaritime contracts." *Kirby*, 543 U.S. at 23. Instead, general principles steer our "case-by-case approach" for determining whether an agreement is a maritime contract. *Folksamerica Reins. Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005). We consult "precedent and usage [for] help[] insofar as they exclude or include certain common types of contract." *Id.* (brackets omitted) (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)). But when our quest to categorize an agreement draws us into uncharted waters, ultimately "the answer 'depends upon the nature and character

17

of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Kirby*, 543 U.S. at 24 (ellipsis omitted) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbldg. Co.*, 249 U.S. 119, 125 (1919)). In other words, we ask whether the "principal objective" of the agreement is "maritime commerce." *Id.* at 25; *see id.* at 23–24. The Supreme Court has cautioned that this inquiry is "conceptual" and not constrained by the location of contract performance or a vessel's involvement in the dispute. *Id.* at 24. Our beacon is "the purpose of the jurisdictional grant—to protect maritime commerce." *Folksamerica*, 413 F.3d at 311 (citing *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991); *Sisson v. Ruby*, 497 U.S. 358, 367 (1990)).

We discern enough maritime flavor in the d'Amico-Primera FFA to conclude that there is federal subject matter jurisdiction over this case. Where the identity of at least one party (here, d'Amico's identity as a shipping business) aligns with the substance of the agreement (here, the parties' respective estimations of the market rate for freight on vessels and certain routes integral to at least one party's business), the resulting agreement is distinctly briny. Thus, when a party that is exposed to fluctuating shipping prices in its operations enters

18

into an FFA to be settled against a future value of the market to which it is exposed, the FFA is part of that party's shipping business and a maritime contract.

Here, undisputedly, at least one of the contracting parties is primarily engaged in the shipping business. Indeed, both fit this description: Primera is a ship management company; d'Amico owns and operates vessels that ship commodities worldwide. Bonaso, d'Amico's general manager, testified that trading FFAs generated just two or three percent of d'Amico's revenue in 2008. D'Amico's primary business is shipping. Because of its participation in the shipping industry, d'Amico is exposed to shifts in shipping prices.

The parties' identities as shipping outfits provide further context for the agreement. In particular, the collateral for the d'Amico-Primera FFA was likely vessels. As was ordinary at the time, no security was required for the agreement. Each party bore the risk that its counterparty would default. But because the parties to the contract owned vessels, the counterpart party could pursue the shirker's vessels for satisfaction of the debt—as apparently happened here. *See D'Amico*, 201 F. Supp. 3d at 407 ("Since 2009, vessels connected to the defendants in this case were attached in the Central District of California, the Eastern and Southern Districts of Texas, and the Eastern District of Louisiana.").

19

As to the substance of the agreement, the d'Amico-Primera FFA not only refers to maritime transactions generally, but also reflects the specific contours of d'Amico's shipping business. As already explained, the agreement concerns the market price for shipping goods on certain types of vessels along certain routes during certain months. The very vessels and routes referred to in the agreement reflect a segment of d'Amico's physical shipping business: the settlement rate is the mean price for shipping via a type of vessel employed (Panamax vessels) and a group of routes plied (the standard routes traveled by Panamax vessels) by d'Amico at the time of the contract. Bonaso testified that he sold an FFA to be measured against the BPI—as opposed to another of the several indices published by the Baltic Exchange—because of this congruity. His explanation is consistent with Albers's testimony that a vessel owner shielding itself from price risk would sell an FFA settled against the rate for shipping on routes travelled by its vessels.[6]

---

[6] The district court found that Bonaso's testimony supporting d'Amico's claim that it used the d'Amico-Primera FFA "not for simple financial speculations but rather as a means to hedge against the possible underuse of its fleet and, thereby, to promote maritime commerce" was "not credible." *D'Amico*, 201 F. Supp. 3d at 405. We do not read the district court's decision as finding all aspects of Bonaso's testimony not credible. Indeed, the district court relied on Bonaso's testimony for some of its findings of fact. *See, e.g., id.* at 402–03. Considering the record, we see no reason to conclude that the district court rejected Bonaso's testimony about why this FFA was to be settled against the BPI.

These design choices support d'Amico's claim that—as stated in d'Amico's 2008 Director's Report—d'Amico used FFAs like this one to temper its "expos[ure] to movements in market prices arising from its operations." Joint App'x 739.

Regardless of the district court's conclusion that d'Amico did not use this (or any) FFA to hedge risk in the manner endorsed by Albers, we are of the view that d'Amico's sale of an FFA valued against market shipping rates to which it was exposed in its operations was directed toward managing risks inherent in its shipping business. Said differently, as a component of d'Amico's shipping business, the FFA's principal objective was facilitating maritime commerce. In these circumstances, we have no doubt that the d'Amico-Primera FFA was "'entered into in connection with [a] maritime commercial venture and [is] therefore maritime in nature,'" *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008) (quoting *Williamson v. Recovery Ltd. P'ship*, No. 06-cv-5724(LTS)(FM), 2007 WL 102089, at *2 (S.D.N.Y. Jan. 16, 2007)). Federal subject matter jurisdiction therefore exists here.[7]

_____

[7] As should be clear from the foregoing analysis, even if d'Amico's counterparty were not in the shipping business, the instrument would remain designed to function as a hedge against risks inherent in maritime commerce under our holding. This accords with the roughly analogous maritime insurance context (discussed herein), where the

21

This conclusion is consistent with our reasoning in the maritime insurance context. On facts like those here, an FFA bears some resemblance to a maritime insurance policy. Specifically, FFAs shield "against the vagaries of future maritime price fluctuations," *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 354 (4th Cir. 2014), just as maritime insurance policies protect against losses like shipwreck or liability for discharging pollutants into the sea. We routinely conclude that insurance policies covering marine risks fall within our maritime jurisdiction. *See, e.g.*, *Fireman's Fund Ins.*, 822 F.3d at 634 (stating that insurance "for pollution coverage for a [floating dry-dock, a] structure used in vessel repair and maintenance . . . directly implicate[d] the business of maritime commerce"); *Folksamerica*, 413 F.3d at 310, 323 (holding that an insurance policy covering a ship tank cleaning company was a maritime contract). We see no compelling reason to treat a contract designed to ameliorate the risks posed by a fluctuating market differently from one drafted to protect against financial devastation from the realization of physical risks.

---

inquiry is not whether the issuer writes only maritime policies, but instead what coverage the policy provides. *See, e.g.*, *Folksamerica*, 413 F.3d at 314–15.

22

The only other circuit to resolve the question of whether an FFA may qualify as a maritime contract reached a similar conclusion. *See Flame S.A.*, 762 F.3d at 363. In *Flame S.A.*, the plaintiff entered four FFAs, the counterparty breached, and the plaintiff obtained a judgment against the counterparty from an English court. *Flame S.A. v. Indus. Carriers, Inc.*, No. 2:13-cv-658, 2014 WL 108897, at *1 (E.D. Va. Jan. 10, 2014). Then, the plaintiff sued in U.S. federal court and obtained an attachment of a vessel belonging to the counterparty's alleged alter ego. *Id.* A motion to vacate the attachment order on the ground that the district court lacked subject matter jurisdiction was denied; the district court observed that the FFAs were "singularly concerned with shipping routes," and that the plaintiff had apparently used them "primarily for hedging the risks inherent in [its] shipping business." *Id.* at *3. Therefore, the dispute implicated the court's admiralty jurisdiction. *Id.* On interlocutory appeal, the Fourth Circuit affirmed. *Flame S.A.*, 762 F.3d at 363. The affirmance rested on two characteristics of the FFAs in that case: First, both parties to the agreements were shipping businesses. *See id.* at 362 & n.9. Second, it followed from the parties' identities as shipping businesses and the contents of the agreements that the parties "did not create the FFAs as mere financial speculators, but as a component of their shipping

23

businesses." *Id.* at 362. In other words, the purpose of the FFAs was essentially inferable from the identities of the parties and the substance of their agreements. *See id.* The court of appeals, therefore, easily affirmed the district court's conclusion that the purpose of the agreements was to hedge against the risks of the shipping business. *See id.*

Here, the crux of the district court's holding was that the d'Amico-Primera FFA did not satisfy the "principal objective" test because d'Amico failed to establish that—subjectively—it made the agreement to protect against the underemployment of specific vessels. *See D'Amico*, 201 F. Supp. 3d at 407, 412. The district court cast its holding in broad terms about the absence of evidence that d'Amico used FFAs to hedge risk at all. *Id.* at 411. But a closer examination reveals that the district court based its holding primarily on its determination that d'Amico's "trading pattern" resembled the behavior of "a derivatives trader" rather than of "a shipowner who was hedging a physical position in the freight market." *Id.* at 412.

There are two key flaws in this analysis. First, as already explained, the risks that a shipping company faces in the conduct of its business are not limited to the risk that any particular vessel will remain docked. Shipping companies

24

like d'Amico are exposed to, among other things, broader shifts in shipping prices. We see no reason to distinguish among instruments designed to mitigate these related risks. Second, the north star for maritime contract jurisdiction is an agreement's relationship with maritime commerce, not its tie to any particular vessel (or seaman, or shipment). Requiring a connection with a specific vessel is in tension with *Kirby*'s express instruction that the existence of maritime contract jurisdiction cannot be resolved by resort to questions like whether a vessel was involved in the dispute or where the contract was made or meant to be performed. 543 U.S. at 23–24; *see also Folksamerica*, 413 F.3d at 323–24 (holding that an insurance policy is a maritime contract even when it does not cover an identified vessel or shipment).

Our approach also avoids the serious practical consequences of anchoring subject matter jurisdiction to a party's intent in making an FFA. The nature of a party's principal business and the substance of a contract can likely be ascertained from relatively uncomplicated documentary evidence. Resting the question of maritime contract jurisdiction on a party's subjective intent in making an agreement, however, invites a far more complex evidentiary showing. A district court might be forced to hold a hearing (or receive evidence during trial) in nearly

25

every case before determining its jurisdiction. The record below illustrates this problem perfectly: the district court heard extensive testimony from the respective principals of d'Amico and Primera on their respective reasons for making the agreement, as well as expert testimony interpreting d'Amico's trading behavior. The necessity for such a showing is not limited to this case because, as the district court acknowledged, whether a party used an FFA to manage risk or to speculate (or for any other purpose) is not apparent from the face of the agreement. *See D'Amico*, 201 F. Supp. 3d at 404–05. Even where the record of a party's trading behavior initially appears to reflect what might be labeled speculative or risk-hedging behavior, the parties would likely seek to contradict that impression with additional evidence, including live testimony. For example, a trade made with the purpose of hedging in the manner required by the district court—that is, held open for enough time to ensure vessel employment—would not necessarily resemble such a hedge if, for example, the trader soon after changed his mind about the tenor of the market. We are disinclined to promote expensive litigation to resolve the threshold question of jurisdiction. *See D'Amico*, 756 F.3d at 161 ("[Q]uestions of subject matter jurisdiction should be amenable to quick and relatively certain resolution.").

26

Allowing subjective purpose to govern also risks rendering jurisdiction unpredictable. Because the best evidence of a contracting party's intent might be testimony, the existence of jurisdiction could turn primarily on the credibility of a witness (or witnesses)—as it did here. That credibility could be easily undermined on cross-examination, especially when witnesses are asked to explain their motivations for decisions made years before.[8]

Another troubling implication of the district court's position is that the purpose behind a contract—and with it, the existence of federal jurisdiction—may shift over the lifetime of the agreement. After all, Albers testified that an owner selling an FFA "can go into a hedge, but when he changes his mind and if he closes it out, it's not a hedge any longer." Joint App'x 326. Similarly, because a party

---

[8] The timing of testimony is a key distinction between this context and another—diversity of citizenship—in which jurisdiction turns in part on a party's intent and, potentially, credibility. Specifically, in the diversity jurisdiction context, "[a]n individual's citizenship . . . is determined by his domicile" which is "'the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the *intention* of returning.'" *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000) (emphasis added) (quoting *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998)). But the intent-to-remain inquiry is likely less susceptible to manipulation because a party's citizenship is analyzed at the time the suit is filed, *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004), not at the time of a contract underlying the suit. Because the latter is in the more distant past, the memories of those with knowledge relevant to the jurisdictional inquiry may be less crisp and the truth harder to discern.

27

may close its position by making a new contract with a third party, the district court's position would allow a contract to be divested of its maritime character—and federal courts divested of their jurisdiction over a claim arising from that contract—by a separate, later-in-time agreement. Uncertainty is a particularly acute concern in this context because "§ 1333 vests admiralty jurisdiction *exclusively* in the federal courts," which means "parties concerned about uncertain federal jurisdiction cannot, as is generally the case, avoid the problem by bringing suit in a state court of concurrent (and unquestionable) jurisdiction." *D'Amico*, 756 F.3d at 162. Moreover, a rule rendering jurisdiction readily manipulated or ephemeral destabilizes contract enforcement, undermining the very purpose of § 1333's jurisdictional grant, "'the protection of maritime commerce,'" *Exxon Corp.*, 500 U.S. at 608 (quoting *Sisson*, 497 U.S. at 367).

Finally, Primera argues that "it is significant that other [non-U.S.] jurisdictions have uniformly held that FFAs are not maritime contracts." Appellee's Br. at 20. The last time this case was before us, we considered the "general proposition" that there exists "widespread agreement throughout the world" about which matters are maritime and concluded that it was not controlling. *D'Amico*, 756 F.3d at 160. Our analysis bears repeating here:

28

> [T]here is no assurance that some other nation might not define its own maritime jurisdiction more broadly, or more narrowly, than we do. It seems reasonable to assume that the Framers of the Constitution and Congress wanted to ensure that matters deemed maritime *under our laws* have access to our federal courts. There is no reason to suppose that the Founders or Congress would have wished to exclude from the admiralty jurisdiction matters that U.S. law deems maritime, merely because another nation does not consider them maritime.

*Id*. In addition, it seems reasonable that our admiralty jurisdiction might sweep more broadly than that of foreign jurisdictions in light of our federal system. Our "touchstone" for the interpretation of maritime contracts "is a concern for the uniform meaning of maritime contracts" throughout the United States. *Kirby*, 543 U.S. at 28. For this reason, a maritime contract is governed by federal substantive law unless the dispute is "inherently local." *Id.* at 27. Excluding FFAs from our admiralty jurisdiction would require parties seeking to enforce them in the United States to litigate in state courts, subject to varying state laws. Primera's position completely ignores the burden that litigating in the shadow of such variation could impose on FFA investors involved in the shipping business.

In sum, we are persuaded that the d'Amico-Primera FFA is a maritime contract. One of the many threats to d'Amico's shipping business was the risk

29

that shipping rates would decline. Through the agreement, d'Amico expressed its view that the market rate for shipping in one of its business segments would not exceed a certain rate. The agreement ensured that if market conditions meant d'Amico chartered some of its vessels for less during the relevant period, it would recover the difference between its prediction and the actual state of the market. The absence of evidence that d'Amico used the FFA to hedge against the underuse of specific vessels is irrelevant. D'Amico's risks as a shipping business are more generalized than the risk that a particular vessel is underemployed. In any event, there is no requirement that a maritime contract concern a particular vessel, seaman, or shipment. *See, e.g.*, *Flame S.A.*, 762 F.3d at 362 (citing *Kirby*, 543 U.S. at 23). Finally, the practical consequences of permitting a party's subjective intent to determine the maritime nature of a contract tug firmly against applying such a rule. We therefore conclude that the d'Amico-Primera FFA is a maritime contract, over which the district court had admiralty jurisdiction pursuant to § 1333.[9]

---

[9] Because we conclude that, even assuming the district court's factual findings were correct, its legal conclusion was erroneous, we have no occasion to consider d'Amico's further contention that Albers's testimony did not satisfy the requirements of Federal Rule of Evidence 702.

## II

One final matter remains: Primera seeks sanctions against d'Amico, arguing that this appeal is frivolous because it is based on Bonaso's discredited testimony and lacks any basis in law. Primera asks this Court to sanction d'Amico pursuant to Federal Rule of Appellate Procedure 38; 28 U.S.C. § 1927; and our inherent authority to manage the litigation before us, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). We have ordered sanctions not only where an appeal is "'patently frivolous'" but also where "the conduct of the sanctioned litigant or attorney evinces bad faith or an egregious disrespect for the Court or judicial process." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Gallop v. Cheney*, 642 F.3d 364, 370 (2d Cir. 2011)).

There is no basis for sanctioning d'Amico here. Primera's first contention—that d'Amico improperly relies upon Bonaso's discredited testimony about d'Amico's purpose for entering the FFA—is incorrect. As already explained, d'Amico's argument (indeed, our holding) is that evidence about the subjective purpose for entering into an FFA is irrelevant to the question of admiralty jurisdiction. We disagree, moreover, with Primera's claim that the assertion for which d'Amico cited a snippet of Bonaso's trial testimony—that

d'Amico "used the FFA in dispute as a component of its shipping business" and used FFAs in its "shipping business . . . to manage . . . freight rate fluctuations," Appellant's Br. at 33 (citing Joint App'x 68–69)—is inconsistent with the district court's conclusion that there was no credible evidence that d'Amico used the d'Amico-Primera FFA "to hedge its shipping business or to protect its physical shipping positions," *D'Amico*, 201 F. Supp. 3d at 411. As stated above, the district court concluded merely that there was no evidence that d'Amico "hedged" in the specific way described by Albers, a determination that is not relevant to our conclusion.

In addition, we reject Primera's claim that this appeal was frivolous. In the first place, we found d'Amico's claim to be meritorious. But even if we had affirmed the district court's decision, sanctions are inappropriate in an appeal— such as this one—that presents a substantial question of first impression in this Court. *See Clarendon Nat'l Ins. Co. v. Kings Reins. Co., Ltd.*, 241 F.3d 131, 135 (2d Cir. 2001); *Upton v. IRS*, 104 F.3d 543, 547 (2d Cir. 1997) (per curiam).

## CONCLUSION

For the foregoing reasons, we VACATE the district court's judgment and REMAND for further proceedings consistent with this opinion.